BOATLAND OF HOUSTON,
INC., Petitioner,

v.

Valerie BAILEY et al., Respondents.

No. B–8827.

Supreme Court of Texas.

July 30, 1980.

On Rehearing Dec. 17, 1980.

Butler, Binion, Rice, Cook and Knapp, Donald B. McFall, Richard A. Sheehy and Richard E. Gray, III, Houston, for petitioner.

Kronzer, Abraham & Watkins, James E. Robinson, Edwards & Hitt, Tom Edwards, Houston, for respondents.

McGEE, Justice.

This is a product defect case involving an alleged defect in the design of a 16-foot bass boat. The plaintiffs were the widow and adult children of Samuel Bailey, who was killed in a boating accident in May of

1973. They sued under the wrongful death statute, alleging that Samuel Bailey's death occurred because the boat he was operating was defectively designed. The boat had struck a partially submerged tree stump, and Bailey was thrown into the water. With its motor still running, the boat turned sharply and circled back toward the stump. Bailey was killed by the propeller, but it is unclear whether he was struck when first thrown out or after the boat circled back toward him.

Bailey's wife and children sought damages under a strict liability theory from the boat's seller, Boatland of Houston, Inc. At trial, they urged several reasons why the boat was defectively designed, including inadequate seating and control area arrangement, unsafe stick steering and throttle design, and the failure of the motor to automatically turn off when Bailey was thrown from the boat.

The trial court rendered a take-nothing judgment based on the jury's failure to find that the boat was defective and findings favorable to Boatland on several defensive issues. The court of civil appeals, with one justice dissenting, reversed and remanded the cause for a new trial because of errors in the admission of evidence and the submission of the defensive issues.[1] 585 S.W.2d 805. We reverse the judgment of the court of civil appeals and affirm that of the trial court.

EVIDENCE OF DESIGN DEFECT

The alleged design defects are causally related to Bailey's being thrown from the boat and struck by the propeller and not to the boat's hitting the stump. Nevertheless, the same rules of strict liability govern cases in which the defect caused the initial accident and cases in which the defect caused the injuries. *Turner v. General Motors Corp.*, 584 S.W.2d 844, 848 (Tex. 1979).

In *Turner v. General Motors Corp.*, this court discussed the strict liability standard of "defectiveness" as applied in design defect cases. Whether a product

---

1. Because no error was assigned to the jury's failure to find that Bailey's adult children suffered pecuniary loss, the cause was severed and remanded only as to Mrs. Bailey's claims.

was defectively designed requires a balancing by the jury of its utility against the likelihood of and gravity of injury from its use. The jury may consider many factors before deciding whether a product's usefulness or desirability are outweighed by its risks. Their finding on defectiveness may be influenced by evidence of a safer design that would have prevented the injury.[2] *Turner v. General Motors Corp., supra* at 849. *See* Keeton, *Product Liability and the Meaning of Defect,* 5 St. Mary's L.J. 30, 38 (1973); Wade, *Strict Tort Liability of Manufacturers,* 19 Sw.L.J. 5, 17 (1965). Because defectiveness of the product in question is determined in relation to safer alternatives, the fact that its risks could be diminished easily or cheaply may greatly influence the outcome of the case.

Whether a product was defectively designed must be judged against the technological context existing at the time of its manufacture. Thus, when the plaintiff alleges that a product was defectively designed because it lacked a specific feature, attention may become focused on the feasibility of that feature—the capacity to provide the feature without greatly increasing the product's cost or impairing usefulness. This feasibility is a relative, not an absolute, concept; the more scientifically and economically feasible the alternative was, the more likely that a jury may find that the product was defectively designed. A plaintiff may advance the argument that a safer alternative was feasible with evidence that it was in actual use or was available at the time of manufacture. Feasibility may also be shown with evidence of the scientific and economic capacity to develop the safer alternative. Thus, evidence of the actual use of, or capacity to use, safer alternatives is relevant insofar as it depicts the available scientific knowledge and the practicalities of applying that knowledge to a product's design. This method of presenting evidence of defective

design is not new to the Texas law of product liability. *See, e. g., Rourke v. Garza,* 530 S.W.2d 794 (Tex. 1975); *Henderson v. Ford Motor Co.,* 519 S.W.2d 87 (Tex. 1974); *Williams v. General Motors Corp.,* 501 S.W.2d 930 (Tex.Civ.App.—Houston [1st Dist.] 1973, writ ref'd n.r.e.); *Hartzell Propeller Co. v. Alexander,* 485 S.W.2d 943 (Tex.Civ.App.—Waco 1972, writ ref'd n.r. e.); *Pizza Inn, Inc. v. Tiffany,* 454 S.W.2d 420 (Tex.Civ.App.—Waco 1970, no writ).

As part of their case-in-chief, the Baileys produced evidence of the scientific and economic feasibility of a design that would have caused the boat's motor to automatically shut off when Bailey fell out. According to the Baileys, the boat's design should have incorporated an automatic cut-off system or the boat should have been equipped with a safety device known as a "kill switch."

The deposition of J. C. Nessmith, president of Boatland, was read, in which he stated that there were presently several types of "kill switches" available, and that they were now installed by Boatland when it assembled and sold bass boats.

The deposition of Bill Smith, who was a passenger in the boat with Bailey at the time of the accident, was also read. Smith had not heard of automatic kill switches before the accident, but afterwards he got one for his own boat.

The deposition testimony of George Horton, the inventor of a kill switch designed for open-top carriers, was also introduced. Horton began developing his "Quick Kill" in November of 1972 and applied for a patent in January of 1973. According to Horton, his invention required no breakthroughs in the state of the art of manufacturing or production. He stated that his invention was simple: a lanyard connects the operator's body to a device that fits over the ignition key. If the operator moves, the lanyard is pulled, the device rotates, and the

---

2. In *Turner,* this court stated that a number of evidentiary factors may be considered in determining whether a product's design is defective. The product's usefulness and desirability, the likelihood and gravity of injury from its use,

the ability to eliminate the risk without seriously increasing the product's usefulness or cost, and the expectations of the ordinary consumer are some of these factors. *Turner v. General Motors Corp.,* 584 S.W.2d 844, 849 (Tex. 1979).

ignition switch turns off. When he began to market his "Quick Kill," the response by boat dealers was very positive, which Horton perceived to be due to the filling of a recognized need. He considered the kill switch to be a necessary safety device for a bass boat with stick steering. If the kill switch were hooked up and the operator thrown out, the killing of the motor would prevent the boat from circling back where it came from. Horton also testified that for 30 years racing boats had been using various types of kill switches. Thus, the concept of kill switches was not new.

Robert Swint, a NASA employee who worked with human factors engineering, testified that he had tested a bass boat similar to Bailey's. He concluded that the boat was deficient for several reasons and that these deficiencies played a part in Bailey's death. According to Swint, when the boat struck a submerged object and its operator became incapacitated, the seating and control arrangement caused the boat to go into a hard turn. If the operator were thrown out, the boat was capable of coming back and hitting him. Swint also stated that a kill switch would have cut off the engine and the motor would not have been operative when it hit Bailey.

Jim Buller, who was fishing in the area when Bailey was killed, testified that his own boat did not have a kill switch at that time, but he ordered one within "a matter of days."

Boatland elicited evidence to rebut the Baileys' evidence of the feasibility of equipping boats with kill switches or similar devices in March of 1973, when the boat was assembled and sold. The Baileys had been granted a running objection to all evidence of this nature. In response to the Baileys' evidence that kill switches were presently used by Boatland, Nessmith testified that he did not know of kill switches until the spring of 1973, and first began to sell them a year later.

In response to the Baileys' evidence that the "Quick Kill" was readily available at the time of trial, Horton stated on cross-examination that until he obtained the patent

for his "Quick Kill" in 1974 he kept the idea to himself. Before he began to manufacture them, he investigated the market for competitive devices and found none. The only applications of the automatic engine shut-off concept in use at the time were homemade, such as on racing boats. He first became aware of competitive devices in August of 1974.

Boatland introduced other evidence to show that kill switches were not available when Bailey's boat was sold. The deposition of Jimmy Wood, a game warden, was read in which he stated that he first became aware of kill switches in 1975. He testified that he had a "Quick Kill" on his boat since 1976, and he thought it was the only kill switch made. Willis Hudson, who manufactured the boat operated by Bailey, testified that he first became aware of kill switches in 1974 or 1975 and to his knowledge no such thing was available before then. Ralph Cornelius, the vice-president of a marine appliance dealership, testified that kill switches were not available in 1973. The first kill switch he saw to be sold was in 1974, although homemade "crash throttles" or foot buttons had long been in use.

Apart from evidence of the feasibility of an automatic motor cut-off design, evidence was introduced pertaining to whether such a design would have prevented Bailey's injuries. After considering the feasibility and effectiveness of an alternative design and other factors such as the utility and risk, the jury found that the boat was not defective. The trial court rendered judgment for Boatland. The Baileys complained on appeal that the trial court erred in admitting Boatland's evidence that kill switches were unavailable when Bailey's boat was assembled and sold. The court of civil appeals agreed, holding that the evidence was material only to the care exercised by Boatland and thus irrelevant in a strict liability case.

In its appeal to this court, Boatland contends that the court of civil appeals misconstrued the nature and purpose of its evidence. According to Boatland, when the Baileys introduced evidence that kill

switches were a feasible safety alternative, Boatland was entitled to introduce evidence that kill switches were not yet available when Bailey's boat was sold and thus were not a feasible design alternative at that time.

The primary dispute concerning the feasibility of an alternative design for Bailey's boat was the "state of the art" when the boat was sold. The admissibility and effect of "state of the art" evidence has been a subject of controversy in both negligence and strict product liability cases. In negligence cases, the reasonableness of the defendant's conduct in placing the product on the market is in issue. Evidence of industry customs at the time of manufacture may be offered by either party for the purpose of comparing the defendant's conduct with industry customs. An offer of evidence of the defendant's compliance with custom to rebut evidence of its negligence has been described as the "state of the art defense." *See generally* 2 L. Frumer & M. Friedman, Products Liability § 16A[4][i] (1980). In this connection, it is argued that the state of the art is equivalent to industry custom and is relevant only to the issue of the defendant's negligence and irrelevant to a strict liability theory of recovery.

In our view, "custom" is distinguishable from "state of the art." The state of the art with respect to a particular product refers to the technological environment at the time of its manufacture. This technological environment includes the scientific knowledge, economic feasibility, and the practicalities of implementation when the product was manufactured. Evidence of this nature is important in determining whether a safer design was feasible. The limitations imposed by the state of the art at the time of manufacture may affect the feasibility of a safer design. Evidence of the state of the art in design defect cases has been discussed and held admissible in other jurisdictions. *See, e. g., Raney v. Honeywell, Inc.,* 540 F.2d 932 (8th Cir. 1976); *Caterpillar Tractor Co. v. Beck,* 593 P.2d 871 (Alaska 1979); *Barker v. Lull Engineering Co.,* 20 Cal.3d 413, 573 P.2d 443, 143 Cal.Rptr. 225 (1978); *Kerns v. Engelke,* 76 Ill.2d 154, 28 Ill.Dec. 500, 390 N.E.2d 859 (1979); *Cepeda v. Cumberland Engineering Co., Inc.,* 76 N.J. 152, 386 A.2d 816 (1978). *See generally* J. Sales & J. Perdue, The Law of Strict Tort Liability in Texas 41 (1977). Note, *The State of the Art Defense in Strict Products Liability,* 57 Marq.L.Rev. 491 (1974). Note, *Product Liability Reform Proposals: The State of the Art Defense,* 43 Albany L.Rev. 944, 944–45 (1979). In this case, the evidence advanced by both parties was relevant to the feasibility of designing bass boats to shut off automatically if the operator fell out, or more specifically, the feasibility of equipping bass boats with safety switches.

The Baileys offered state of the art evidence to establish the feasibility of a more safely designed boat: They established that when Bailey's boat was sold in 1973, the general concept of a boat designed so that its motor would automatically cut off had been applied for years on racing boats. One kill switch, the "Quick Kill," was invented at that time and required no mechanical breakthrough. The Baileys were also allowed to show that other kill switches were presently in use and that the defendant itself presently installed them.

Logically, the plaintiff's strongest evidence of feasibility of an alternative design is its actual use by the defendant or others at the time of manufacture. Even if a safer alternative was not being used, evidence that it was available, known about, or capable of being developed is relevant in determining its feasibility. In contrast, the defendant's strongest rebuttal evidence is that a particular design alternative was impossible due to the state of the art. Yet the defendant's ability to rebut the plaintiff's evidence is not limited to showing that a particular alternative was impossible; it is entitled to rebut the plaintiff's evidence of feasibility with evidence of limitations on feasibility. A suggested alternative may be invented or discovered but not be feasible for use because of the time necessary for its application and implementation. Also, a suggested alternative may be available, but

impractical for reasons such as greatly increased cost or impairment of the product's usefulness. When the plaintiff has introduced evidence that a safer alternative was feasible because it was used, the defendant may then introduce contradictory evidence that it was not used.

 Thus in response to the Baileys' evidence of kill switch use in 1978, the time of trial, Boatland was properly allowed to show that they were not used when the boat was sold in 1973. To rebut proof that safety switches were possible and feasible when Bailey's boat was sold because the underlying concept was known and the "Quick Kill," a simple, inexpensive device had been invented, Boatland was properly allowed to show that neither the "Quick Kill" nor any other kill switch was available at that time.

 It could reasonably be inferred from this evidence that although the underlying concept of automatic motor cut-off devices was not new, kill switches were not as feasible an alternative as the Baileys' evidence implied. Boatland did not offer evidence of technological impossibility or absolute nonfeasibility; its evidence was offered to show limited availability when the boat was sold. Once the jury was informed of the state of the art, it was able to consider the extent to which it was feasible to incorporate an automatic cut-off device or similar design characteristic into Bailey's boat. The feasibility and effectiveness of a safer design and other factors such as utility and risk, were properly considered by the jury before it ultimately concluded that the boat sold to Bailey was not defectively designed.[3]

 In cases involving strict liability for defective design, liability is determined by the product's defective condition; there is no need to prove that the defendant's conduct was negligent. Considerations such as the utility and risk of the product in

question and the feasibility of safer alternatives are presented according to the facts as they are proved to be, not according to the defendant's perceptions. Thus, even though the defendant has exercised due care his product may be found defective. When the Baileys introduced evidence of the use of kill switches, Boatland was entitled to introduce rebuttal evidence of non-use at the time of manufacture due to limitations imposed by the state of the art. Evidence offered under these circumstances is offered to rebut plaintiff's evidence that a safer alternative was feasible and is relevant to defectiveness. It was not offered to show that a custom existed or to infer the defendant's compliance therewith. We would be presented with a different question if the state of the art in 1973 with respect to kill switches had not been disputed and Boatland had attempted to avoid liability by offering proof that Bailey's boat complied with industry custom.

## THE DEFENSIVE ISSUES

In its remaining points of error Boatland contends that the submission of several defensive issues was proper, and alternatively, error in their submission, if any, was harmless. Three defensive issues were submitted, and the jury found that Bailey had misused the boat, had failed to follow proper warnings and instructions, and had assumed the risk of injury in using the boat as he did.

The Baileys reply that the submission of the misuse and assumption of the risk issues was not warranted by any evidence. They also urge that failure to follow warnings was not a defense in this case.

 Assuming without deciding that the Baileys are correct, we believe that the error, if any, in the submission of the defensive issues was harmless. The improper submission of issues constitutes reversible error when harm is suffered by the com-

---

**3.** This opinion, insofar as it holds that certain evidence of the state of the art is admissible on the issue of defectiveness in product design cases, is not intended to suggest that such evidence constitutes a defense, such as do mis-

use and assumption of the risk. Nor does evidence of the state of the art entitle the defendant to a defensive issue inquiring whether it complied with the state of the art at the time of manufacture.

plaining party. Whether harm has been suffered may be considered in light of the charge as a whole. *Texas Employers Insurance Association v. McKay*, 146 Tex. 569, 210 S.W.2d 147, 149 (1948). Generally, error in the submission of an issue is harmless when the findings of the jury in answer to other issues are sufficient to support the judgment. *Texas & New Orleans Railroad Co. v. McGinnis*, 130 Tex. 338, 109 S.W.2d 160, 163 (1937). An exception exists, however, when the erroneously submitted issue confuses or misleads the jury. *H. E. Butt Grocery Co. v. Johnson*, 226 S.W.2d 501, 504 (Tex.Civ.App.—San Antonio 1949, writ ref'd n.r.e.).

▋ In this case, the jury failed to find that Bailey's boat was defective. This finding was sufficient to support the judgment of the trial court. The focus of the defensive issues was different from the defectiveness issue. The Baileys have failed to demonstrate, and our review of the record fails to disclose, how erroneous submission of the defensive issues would probably result in an improper verdict.

## CONCLUSION

For the reasons stated above the judgment of the court of civil appeals is reversed. The judgment rendered by the trial court, that the Baileys take nothing against Boatland, is affirmed.

POPE, J., concurring, in which BARROW, J., joins.

POPE, Justice, concurring.

I concur in the majority opinion because the jury finding that there was no defect disposes of the cause. I also concur in its holding that state of the art may be developed by the evidence directed at the issue concerning defect, but that state of the art is not itself an issue which should be submitted to the jury. This case, however, dramatically illustrates the problems with shadowy distinctions between defenses in products cases and negligence cases, and the need to reexamine certain defenses.

Defendant Boatland asserted three defenses, each of which the court submitted to the jury, and all of which the jury answered favorably to the defendant Boatland. The jury made findings that (1) decedent misused the boat, (2) decedent failed to follow proper warnings and instructions, and (3) decedent voluntarily assumed the risk.

It is my opinion that all of those defensive issues are issues which mix and ask about the decedent's contributory negligence. The defendant alleged that the decedent misused the boat in these ways: (1) he drove the boat at an unsafe speed, (2) he failed to keep a proper lookout, (3) he permitted passengers to stand in the boat, and (4) he failed to place the motor in a tilt position. Those are traditional contributory negligence allegations even though we call them "misuse" when we move from a negligence case to a products case.

Strict liability is a doctrine which excuses a harmed plaintiff from proving privity of contract and that the seller of goods was negligent. The doctrine looks to the defect in the product and not to the conduct of the supplier. That rule which excuses proof is inapplicable, however, to the plaintiff, because his conduct is and ought to be examined to determine whether it was up to standard or was substandard. Misuse, as in this case, does look to the plaintiff's conduct. Hence, while the conduct of the manufacturer or supplier is not a suitable inquiry in products liability cases, the conduct of the plaintiff is an important inquiry, and we should clarify this fact.

One of the policy reasons for the doctrine of strict liability is that the manufacturer or supplier can spread the losses occasioned by the supplier's defective product; but in spreading those losses, the general consumer should not have to pay additionally for that percentage of the loss that was caused by the plaintiff's own fault.

In an action in which the plaintiff pleads an action in contributory negligence and alternatively as strict liability, the defendant receives an issue on contributory negligence and another issue on misuse. The same evidence bears on both. This is, how-

ever, a double submission of the same acts or omissions. If the jury answers that there was no contributory negligence, but that there was misuse, we run into the problem of conflicts.

Misuse is really contributory negligence, and it would simplify trials if we treated it as such. We should recognize this fact and hold a plaintiff to the standard of an ordinary prudent person or of reasonableness in his use of the product. We should eliminate the confusing misuse defense and return to contributory negligence as an appropriate defense in strict liability cases.

Voluntary assumption of risk should also be eliminated as a viable defense in strict liability cases. There is no more reason for an all-or-nothing defense in strict liability cases than there is in negligence cases. We held in *Farley v. M M Cattle Co.*, 529 S.W.2d 751 (Tex.1975), writing about voluntary assumption of risk, "the reasonableness of an actor's conduct in confronting a risk will be determined under principles of contributory negligence." The doctrine is a variant of contributory negligence, and it stands alone, as an all-or-nothing defense in strict liability cases. As stated by Professor Hadley Edgar in 11 Texas Tech.L.Rev. 22, 50 (1979):

> The strict liability tortfeasor should be allowed a reduction in damages corresponding to the quantum of the victim's contributory negligence. The distribution of loss between the victim and several tortfeasors, either with or without settlement should be applied uniformly rather than turning upon whether the nonsettling tortfeasor was negligent or strictly liable. The legislature's failure to act leaves the supreme court no reasonable alternative except to resolve these issues when next called upon to do so.

The defense under the more familiar format of contributory negligence, which would subsume and supplant the confusing defenses of misuse and voluntary assumption of risk could restore simplicity to the trials of product liability cases. *Daly v. General Motors Corp.*, 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162 (1978). In such a trial, the fault of the supplier and the plaintiff should be apportioned between the products defect and the plaintiffs' sub-par conduct. *See, e. g., Caterpillar Tractor Co. v. Beck*, 593 P.2d 871 (Alaska 1979); *Daly v. General Motors Corp.*, 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162 (1978). The fault of the supplier and the plaintiff should be apportioned in both kinds of cases. We have on two occasions, judicially fashioned a method for such an apportionment. In *General Motors Corp. v. Hopkins*, 548 S.W.2d 344 (Tex.1977), we held that the misuse of a carburetor on a truck was a partial defense to a strict liability action. We also held that the trier of fact should determine the percentages by which the defect and the misuse contributed to cause the event. *General Motors Corp. v. Hopkins, supra* at 352. In *Signal Oil & Gas Co. v. Universal Oil Products*, 572 S.W.2d 320 (Tex.1978), Signal Oil sued the defendant for negligence, strict liability, and breach of implied warranty. We wrote:

> The seller should only be held liable for that portion of the consequential damages caused by the breach of implied warranty. Therefore, this court holds that in a cause of action for breach of an implied warranty the buyer *may not recover* consequential damages to the extent that the buyer's negligence or fault was a concurring proximate cause of such damages. [Emphasis in opinion.]

Sooner or later, and the sooner the better, we must bring products liability cases within a manageable format. Simplicity, order and consistency can be advanced in those cases, in my opinion by:

1. The elimination of the misuse and voluntary assumption of risk issues and by substituting in their place the more familiar issue about contributory negligence on the part of the plaintiff.

2. The submission of a products liability case to determine the percentage that the defective product caused the event and the percentage that the substandard conduct of the plaintiff caused it.

BARROW, J., joins in this concurring opinion.

## ON REHEARING

CAMPBELL, Justice, dissenting.

I dissent.

"State of the art" does not mean "the state of industry practice." "State of the art" means "state of industry knowledge." At the time of the manufacture of the boat in question, the device and concept of a circuit breaker, as is at issue in this case, was simple, mechanical, cheap, practical, possible, economically feasible and a concept seventy years old, which required no engineering or technical breakthrough. The concept was known by the industry. This fact removes it from "state of the art."

Boatland is a retail seller. It is not the manufacturer. From the adoption of strict liability in this case, and consideration of public policy, each entity involved in the chain of commercial distribution of a defective product has been subject to strict liability for injuries thereby caused, even though it is in no way responsible for the creation of a defective product or could not cure the defect. The remedy for a faultless retail seller is an action for indemnity against the manufacturer.

In products liability, the measure is the dangerously defective quality of the specific product in litigation. The focus is on the product, not the reasoning behind the manufacturer's option of design or the care exercised in making such decisions. Commercial availability or defectiveness as to Boatland is not the test. Defectiveness as to the product is the test. If commercial unavailability is not a defense or limitation on feasibility to the manufacturer, it cannot be a defense to the seller.

The manufacturer of the boat, Mr. Hudson, testified as follows as concerns the concept of a "kill switch." It is practically without dispute that this is one of the simplest mechanical devices and concepts known to man. Its function is, can be, and was performed by many and varied simple constructions. It is more a concept than an invention. The concept has been around most of this century. It is admittedly an easily incorporated concept. Was an invention required in order to incorporate a circuit breaker on a bass boat? Absolutely not! Did the manufacturer have to wait until George Horton invented his specific "Quick Kill" switch before it could incorporate a kill switch of some sort on its bass boats? Absolutely not! Mr. Hudson uses an even simpler electrical circuit breaker on his boats.

Mr. Hudson testified he could have made a kill switch himself, of his own, and of many possible designs, but simply did not do it. Why didn't he do it? He didn't think about it. He never had any safety engineer examine his boats. He hadn't heard of such, he puts them on now, but still thinks people won't use them.

Was the manufacturer faced with a limitation or state of the art due to commercial unavailability? No. If the manufacturer of this boat were the defendant in this case, would the majority hold under this evidence that the commercial unavailability of someone else's simple product is a limitation on the manufacturer's capability (feasibility) to incorporate a device performing the same safety function on its boat? Not if any semblance of strict product liability is to be preserved.

The test for defectiveness of a given product is the same, whether the defendant is the manufacturer, wholesaler or retail seller. The focus is upon the product and not the care or conduct of the particular defendant. The majority opinion has made a new test for each.

The next critical point that the majority fails to take cognizance of is that the factors held by this Court in *Turner v. General Motors Corp.*, 584 S.W.2d 844, 848 (Tex. 1979), to apply as to a manufacturer, in its design of a product, have absolutely no relevance or relation to the reasons for holding the mere retail supplier strictly liable to a consumer. The *Turner* decision and its departure from the RESTATEMENT definition of the term "unreasonably dangerous," was limited solely to the liability of a *manufacturer* in its *design* of products. The definition of "unreasonably dangerous" in the RESTATEMENT (2d) of Torts,

§ 402A, Comment (i) remains applicable to a retail supplier who did not participate in the product design. The focus is thus upon the expectation of an ordinary consumer instead of the propriety of the manufacturer's decision as to design. The harm to the plaintiff in the admission of evidence of commercial unavailability to a retail seller lies in the certainty of such evidence to divert the jury's thought to the reasonableness of the supplier's conduct instead of the true issue; whether the danger was beyond the contemplation of the ordinary use.

What is this Court faced with in this case? Nothing more than a defendant seller attempting to avoid liability by offering proof that Bailey's boat complied with industry practice (which it did at that time) but not because of any limitations on manufacturing feasibility at that time. This is an industry practice case. The evidence does not involve "technological feasibility." The law of the majority opinion is that a simple device, not supplied by the manufacturer, is a defense in a strict liability suit, against a retailer, even though the industry practice was created by the manufacturing industry.

There is no dispute that commercially marketed "kill switches" for bass boats were unavailable to Boatland at the time it sold the boat. Horton's "Quick Kill" was unavailable. The important point is that there is no dispute that at the time of the manufacture of Mr. Bailey's boat, a circuit breaker, whether electrical or mechanical could have easily and cheaply been incorporated into the boat.

Evidence of commercial unavailability to this retail seller should not be admissible. If it is, the majority opinion has created a new and separate test for defectiveness for a retail seller in a strict liability case. The type of commercial unavailability evidence offered here is not true limitation on feasibility to the manufacturer and therefore relevant to the existing state of the art, rather, it is the result of practice in the bass boat manufacturing industry. Subjective commercial unavailability to a retail seller does not operate as a limitation on objective state of the art.

Feasibility as to Boatland is not the test. In a design case, the test is one of feasibility, or a limitation on feasibility as to the manufacturer. If, as to the manufacturer, unavailability to a retail seller is due to the manufacturer's custom or standard, then such evidence should not be admitted because this would allow the manufacturer to set its own standards for liability.

I would hold that the trial court erred in permitting such evidence by Boatland to go to the jury, and would affirm the judgment of the Court of Civil Appeals.

I further disagree with the majority opinion and agree with the Court of Civil Appeals on the submission of the issues pertaining to Bailey's conduct in handling the boat. There is no evidence that Bailey was struck when first thrown from the boat. The evidence is that he was hit when the boat circled.

The theory of Valerie Bailey's lawsuit is that if the manufacturer had incorporated a circuit breaker in the manufacture of the boat, the boat motor would have cut off when Mr. Bailey was first thrown from the boat. The boat would not have circled back to where he was thrown and struck him with a rapidly spinning propeller. Under this theory, Mr. Bailey's conduct is not determinative of anything. The result would have been the same if he had been in a stump-free lake, hit a submerged log which had just drifted in, and had been thrown from the boat.

The evidence stated in the opinion of the Court of Civil Appeals clearly shows the alleged conduct of Mr. Bailey in operating the boat was reasonably foreseeable by Boatland. The foreseeability of that deviation in the manufacturer's intended use of the product is relevant to the basic question of whether the product was unreasonably dangerous when and as it was marketed. *General Motors Corp. v. Hopkins,* 548 S.W.2d 344 (Tex.1977).

The harmful effect of the submission of these issues cannot be more vividly displayed than by considering the emphasis

placed on them by counsel for Boatland in his argument to the jury. I would affirm the judgment of the Court of Civil Appeals.

RAY, J., joins in this dissent.