**Affirmed and Memorandum Opinion filed April 9, 2020.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-18-00945-CV

---

## MOHAMMAD ADNAN JAMAL AND MOHAMMAD HARIS KHAN, Appellants

### V.

## LINA HAMMAD, Appellee

---

**On Appeal from the 157th District Court
Harris County, Texas
Trial Court Cause No. 2016-03324**

---

## M E M O R A N D U M   O P I N I O N

Appellee Lina Hammad sued Appellants Mohammad Adnan Jamal and Mohammad Haris Khan (collectively, "Appellants"), alleging that Appellants sexually assaulted her after the trio left a Houston nightclub. The parties proceeded to trial; the jury found in favor of Hammad and assessed approximately $1.68 million in damages. Appellants appealed the trial court's final judgment asserting procedural, sufficiency, and evidentiary challenges. For the reasons

below, we affirm.

## BACKGROUND

Hammad sued Appellants in January 2016 and asserted claims for false imprisonment, assault, intentional infliction of emotional distress, negligence, and gross negligence. The parties proceeded to a jury trial.

Testifying at trial, Hammad said she met Jamal through her brother. Hammad said Jamal asked her on a date and they agreed to meet at Khan's Houston apartment on December 10, 2015. Appellants met Hammad at the apartment complex's entrance and the group returned to Khan's apartment. Hammad testified that she had not met Appellants prior to this occasion. Hammad said she did not have any alcoholic drinks that evening before arriving at Khan's apartment.

At Khan's apartment, Appellants and Hammad waited for another girl, Monica Interiano, to finish getting ready. Hammad said she was offered an alcoholic drink and had a few sips. After spending a few minutes at Khan's apartment, the group departed to the Belvedere Lounge and arrived a few minutes after midnight.

According to Hammad, Appellants ordered drinks for her and Interiano at the Belvedere; Hammad said she consumed one tequila shot and a few sips from a glass of wine. Hammad said she and Appellants walked outside to the Belvedere's patio and Khan proceeded to kiss her. Hammad said she "push[ed] him away" and went to stand by Jamal. Hammad testified that Jamal started kissing her and she kissed back. After that point, Hammad said she "blacked out."

After blacking out, Hammad said she only had "three flashes" of memory: (1) a man's penis in her face; (2) Jamal putting her in the shower and laughing at

2

her; and (3) Jamal sitting her on the bed and asking her if she "was okay," while there was a nude man in the background. According to Hammad, she woke up at about 7:00 a.m. the next morning; she was lying in a bed naked, with blood on the sheets and a naked Khan lying next to her. Hammad grabbed her things and left Khan's apartment. Hammad said she called Jamal to ask what had happened the previous night; Jamal told her she was "drunk" and "throwing up everywhere." Hammad got in her car to drive away and said she was "dizzy" and had "blurry vision."

When Hammad returned to her home, she noticed there were bruises on her body. She went to the emergency room the next day and photographs were taken of bruises on her legs, arms, chest, and buttocks. The emergency room's medical records noted the following under "Clinical Impressions":

> Suspected sexual assault. Assault by bodily force.
>
> Multiple contusions to the left chest, right buttocks, right upper arm, right thigh, right knee and right lower leg and left thigh, left knee and left lower leg.
>
> Possible exposure to STD.

While she was cross examined by Jamal's attorney, Hammad acknowledged that a "rape kit" was performed at the emergency room and that it "showed no male DNA." Hammad said that she had showered three times between leaving Khan's apartment and the emergency room examination.

Describing the events that occurred on December 10, 2015, Jamal said he invited Hammad to hang out with him, Khan, and Interiano but that "it was not a date." Jamal said everyone made their own drinks at Khan's apartment before the group left for the Belvedere. Jamal said he did not buy Hammad any drinks at the Belvedere and was unsure who purchased the shots. According to Jamal, he did not try to kiss Hammad at the Belvedere and did not see her black out.

3

When Appellants and Hammad returned to Khan's apartment, Jamal said Hammad began throwing up. Jamal said he left the apartment to get food for the group; he called Khan and Hammad to see what kind of food they wanted but they did not answer their phones. Jamal said he went home and did not return to Khan's apartment. Jamal denied assaulting Hammad.

Khan also testified that everyone made their own drinks at his apartment before the group left to the Belvedere. Khan denied buying Hammad any drinks. Khan said Hammad was throwing up when they returned to his apartment and Jamal left to get food. Khan said he slept on his apartment sofa and Hammad stayed on the bed; Khan said there was vomit on his bed in the morning. Khan denied assaulting Hammad.

The jury also watched excerpts from the video deposition of Dr. Susan Meixner, Hammad's psychiatrist. Dr. Meixner testified that Hammad suffers from post-traumatic stress disorder ("PTSD") and stated that Hammad regularly experiences a depressed mood and memory problems. On cross examination, Jamal's counsel had the following exchange with Dr. Meixner:

Q. Okay? And we're not talking about her being drugged. She had two drinks voluntarily, correct?

A. Right.

Q. We don't have the evidence of her being drugged. You didn't see any evidence, correct?

A. Right.

After this exchange, Hammad's counsel asserted that the line of questioning opened the door to the remainder of Dr. Meixner's testimony regarding the possibility that Hammad was drugged. The trial court agreed with Hammad's counsel and permitted him to introduce additional excerpts from Dr. Meixner's deposition.

4

Testifying regarding her discussions with Hammad, Dr. Meixner stated that Hammad was "pretty sure someone put something in her drink, but she doesn't know which one." Dr. Meixner again was asked if she had "seen any evidence whatsoever that there were any drugs in [Hammad's] bloodstream or in her urine," to which Dr. Meixner replied: "Well, no, but the point of date-rape drugs is that they don't show up." Dr. Meixner also stated that Hammad's symptoms were consistent with someone who was given a date-rape drug.

After the close of evidence, the jury was instructed with respect to the following claims: false imprisonment; assault; sexual assault; intentional infliction of emotional distress; negligence; and gross negligence. For all claims, the jury responded "Yes" for each of the Appellants. The jury also found that Appellants "conspire[d]" to damage Hammad. The jury assessed $685,300 in compensatory damages. The jury also assessed $500,000 in exemplary damages against Jamal and $500,000 in exemplary damages against Khan.

The trial court signed a final judgment on August 14, 2018, awarding Hammad $340,648.25 in compensatory damages and $1 million in exemplary damages. Appellants filed a motion for new trial one week later. In September 2018, Hammad filed a "Motion for Judgment Nunc Pro Tunc Under Texas Rule of Civil Procedure 316." Asserting the trial court's August 2018 final judgment incorrectly reflected the jury's verdict, Hammad stated the final judgment incorporated a clerical error in the damages calculation that mistakenly was included in Hammad's proposed judgment. Hammad's motion asked the trial court to correct its final judgment and award Hammad $685,296.50 in compensatory damages.

The trial court denied Appellants' motion for new trial in an order signed September 21, 2018. The trial court signed a second final judgment on October 10,

2018, awarding Hammad $685,296.50 in compensatory damages and $1 million in exemplary damages. Appellants timely appealed.

## ANALYSIS

Requesting that this court reverse the trial court's final judgment, Appellants assert seven issues:

1. Hammad "has presented no evidence, or insufficient evidence that Appellants drugged her drink while at Belvedere."

2. "The trial court erroneously found that the Nunc Pro Tunc was a clerical error."

3. Hammad "has presented no evidence, or insufficient evidence that appellants owed [her] a duty."

4. "Did the trial court abuse its discretion by denying to exclude Dr. Meixner and, if so, is this reversible error?"

5. "There is no evidence, or alternatively, factually insufficient evidence to support any of the damages awarded to [Hammad]."[1]

6. "There is no evidence, or alternatively, factually insufficient evidence to support any of the claim of Gross Negligence."

7. "There is no evidence, or alternatively, factually insufficient evidence to support any of the claim of Intentional Infliction of Emotional Distress."

For ease, we consolidate these seven issues into three groups challenging (1) the trial court's October 2018 judgment; (2) the jury's responses to certain claims; and (3) the trial court's admission of Dr. Meixner's conclusion that Hammad suffers from PTSD. We begin by addressing Appellants' challenges to the trial court's final judgment and the jury's responses; we then consider Appellants' challenge to Dr. Meixner's testimony. *See* Tex. R. App. P. 44.3; *Nat. Gas Pipeline Co. of Am.*

---

[1] Although the title of this issue appears to challenge the jury's damages findings, the argument contained within this issue challenges the jury's finding with respect to Hammad's assault claim and asserts the evidence does not show Appellants made direct or indirect contact with Hammad.

6

*v. Pool*, 124 S.W.3d 188, 201 (Tex. 2003) (when an appellant asserts multiple grounds for reversal of the trial court's judgment, an appellate court first should address all issues that would require rendition and then, if necessary, consider issues that would result in remand).

## I.    The Trial Court's October 2018 Final Judgment

In their second issue, Appellants challenge the trial court's October 2018 final judgment and assert the trial court "erroneously found that the Nunc Pro Tunc was a clerical error."

A trial court may issue a judgment nunc pro tunc following the expiration of its plenary power to correct a clerical error made in entering a final judgment. *Escobar v. Escobar*, 711 S.W.2d 230, 231 (Tex. 1986); *In re A.M.C.*, 491 S.W.3d 62, 66 (Tex. App.—Houston [14th Dist.] 2016, no pet.). But here, the trial court's October 2018 final judgment did not constitute a judgment nunc pro tunc because it was granted while the trial court retained plenary power to vacate, amend, or correct its judgment. *See* Tex. R. Civ. P. 329b(e), (f).

The trial court signed the first final judgment on August 14, 2018. Appellants timely filed a new trial motion on August 21, 2018, and filed an amended motion on August 22, 2018. The trial court signed an order denying Appellants' amended new trial motion on September 21, 2018. Because of these actions, the trial court's plenary power was extended to October 21, 2018. *See id.* at (e) ("If a motion for new trial is timely filed by any party, the trial court . . . has plenary power to grant a new trial or to vacate, modify, correct, or reform the judgment until thirty days after all such timely-filed motions are overruled, either by a written and signed order or by operation of law, whichever occurs first.").[2]

---

[2] The trial court's signed order denying Appellants' motion for new trial occurred before the motion would have been overruled by operation of law on November 4, 2018. *See* Tex. R.

While it retains plenary power, the trial court can correct clerical and judicial mistakes as well as vacate or set aside the judgment. *Id.* 329b(d); *see also In re Gillespie*, 124 S.W.3d 699, 702 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding) ("Plenary power refers to that period of time in which a trial court may vacate its judgment by granting a new trial, or in which it may modify or correct its judgment."). Here, the trial court signed the second final judgment on October 10, 2018, before the expiration of its plenary power on October 21, 2018. The trial court therefore had jurisdiction to modify its judgment and the October 10, 2018 judgment is a valid final judgment. *See Mathes v. Kelton*, 569 S.W.2d 876, 878 (Tex. 1978) (although the trial court's judgment could not be upheld as a judgment nunc pro tunc because it did not correct a clerical error, the judgment was signed "within the trial court's plenary power" and therefore was "a valid final judgment"); *see also Ferguson v. Naylor*, 860 S.W.2d 123, 126-27 (Tex. App.—Amarillo 1993, writ denied); *Alford v. Whaley*, 794 S.W.2d 920, 922 (Tex. App.—Houston [1st Dist.] 1990, no writ). Appellants' argument on this point — focusing only on the judgment's validity as a nunc pro tunc judgment — does not contend that the trial court's modification was in error.

We overrule Appellants' second issue.

## II.  The Jury's Liability Findings

In their third, fifth, sixth, and seventh issues, Appellants challenge the sufficiency of the evidence supporting the jury's liability findings with respect to Hammad's claims for negligence, assault, gross negligence, and intentional infliction of emotional distress. In their first issue, Appellants assert there is "no evidence, or insufficient evidence that Appellants drugged [Hammad's] drink

---

Civ. P. 329b(c) (if the trial court does not rule on a new trial motion, the motion is deemed overruled by operation of law 75 days after the judgment was signed).

8

while at Belvedere." We measure the sufficiency of the evidence by the jury charge when, as here, there has been no objection to it. *See Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005).

## A.    The Jury's Findings in Response to Questions No. 1-7

The first four jury questions instructed the jury as follows, with separate blanks after each question for each of the Appellants:

**Question No. 1**

Did either of [Appellants] falsely imprison [Hammad]?

\*              \*              \*

**Question No. 2**

Did either of [Appellants] commit an assault against [Hammad]?[3]

\*              \*              \*

**Question No. 3**

Did either of [Appellants] intentionally inflict severe emotional distress on [Hammad]?[4]

\*              \*              \*

**Question No. 4**

Did the negligence, if any, of [Appellants] proximately cause injury to [Hammad]?[5]

The jury responded "Yes" to all questions for each of the Appellants. Questions No. 5 and 6 inquired separately with respect to Appellants' liability for conspiracy:

---

[3] Appellants challenge the jury's response to this claim in their fifth issue and assert that Hammad did not present any evidence showing Appellants made direct or indirect contact with her person as necessary to prove a claim for assault.

[4] Appellants challenge the jury's response to this claim in their seventh issue and assert that an intentional infliction of emotional distress claim may only be used as a "gap filler" tort.

[5] Appellants challenge the jury's response to this claim in their third issue and assert that Hammad did not present evidence showing that Appellants owed her a legal duty as necessary to maintain a claim for negligence.

9

**Question No. 5**

Was Mohammad Haris Khan part of a conspiracy that damaged [Hammad]?

\* \* \*

**Question No. 6**

Was Mohammad Adnan Jamal part of conspiracy that damaged [Hammad]?

The jury responded "Yes" to Questions No. 5 and 6. Question No. 7 instructed the jury with respect to damages:

If you answered "Yes" to any of Questions 1, 2, 3, 4, 5, or 6, then answer the following question. Otherwise, do not answer the following question.

**Question No. 7**

What sum of money, if paid now in cash, would fairly and reasonably compensate [Hammad] for her injuries, if any, that resulted from the occurrence in question?

Consider the elements of damages listed below and none other.

\* \* \*

1. Physical pain and mental anguish sustained in the past.
2. Physical pain and mental anguish that, in reasonable probability, Plaintiff Hammad will sustain in the future.
3. Medical care expenses incurred in the past.
4. Medical cause expenses that, in reasonable probability, Plaintiff Hammad will incur in the future.

The jury awarded the following damages for each category: (1) $300,000 for past physical pain and mental anguish; (2) $250,000 for future physical pain and mental anguish; (3) $5,300 for past medical care; and (4) $130,000 for future medical care.

Appellants assert on appeal legal sufficiency challenges to the jury's "Yes" responses to Questions No. 2 (assault), No. 3 (intentional infliction of emotional

10

distress), and No. 4 (negligence).[6] Appellants raised these sufficiency challenges at the charge conference and in their motion for judgment notwithstanding the verdict, preserving them for our review. *See K.J. v. USA Water Polo, Inc.*, 383 S.W.3d 593, 600 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

When charge questions are submitted in a manner that allows the appellate court to determine whether the jury's verdict was based on a valid theory of liability, any error associated with the inclusion of certain questions may be harmless. *Thota v. Young*, 366 S.W.3d 678, 693-94 (Tex. 2012); *see also City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995); *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 750 (Tex. 1980). When determining whether harm occurred, we consider the charge as a whole. *Thota*, 366 S.W.3d at 694.

"Generally, error in the submission of an issue is harmless when the findings of the jury in answer to other issues are sufficient to support the judgment." *Boatland of Houston, Inc.*, 609 S.W.2d at 750. But an exception exists when the erroneously-submitted issue confuses or misleads the jury as to all of the issues or theories that are sufficient to support the judgment. *Id.*; *see also Hatfield v. Solomon*, 316 S.W.3d 50, 63 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

Here, Appellants' legal sufficiency challenges address only three of the claims that underlie the jury's damages assessment — Appellants do not challenge the jury's "Yes" response to Question No. 1, which submitted Hammad's false imprisonment claim. Per the jury charge's instructions, a "Yes" response to this question was sufficient to support the trial court's judgment awarding damages

---

[6] Appellants also appear to assert factual sufficiency challenges with respect to some of these findings. To the extent Appellants raise factual sufficiency challenges, we conclude these issues are waived because they were not raised in Appellants' new trial motion. *See* Tex. R. Civ. P. 324; *see also Reule v. M & T Mortg.*, 483 S.W.3d 600, 609 (Tex. App.—Houston [14th Dist.] 2015, pet. denied).

11

against Appellants. Appellants do not argue, and our review of the record fails to show, that an erroneous submission of the challenged claims would have confused or misled the jury with respect to its determination in response to Question No. 1. Appellants also do not challenge the damages question's predication on a "Yes" answer to any of the submitted theories of liability. Absent any evidence that the alleged errors probably caused the rendition of an improper judgment, we must affirm the trial court's judgment. *See Boatland of Houston, Inc.*, 609 S.W.2d at 750 (alleged error in the submission of an issue is harmless when the findings of the jury in answer to other issues are sufficient to support the trial court's judgment).

We overrule Appellants' third, fifth, and seventh issues challenging the jury's liability findings with respect to Hammad's claims for negligence, assault, and intentional infliction of emotional distress.

**B.     The Jury's Findings in Response to Questions No. 8-9**

Question No. 8 instructed the jury as follows with respect to Hammad's gross negligence claim:

**Question No. 8**

Do you find by clear and convincing evidence that the harm to [Hammad] resulted from gross negligence?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Gross negligence" means an act or omission by either of those defendants named below,

1. Which when viewed objectively from the standpoint of Defendant at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

2. Of which the Defendant has actual, subjective awareness of the

12

risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

The jury answered "Yes" for each Appellant in response to Question No. 8. Question No. 9 was predicated on an affirmative answer to Question No. 8 and asked the jury to assess a "sum of money" that "should be awarded to Plaintiff Hammad as exemplary damages for the conduct found in response to Questions 1, 2, 3, 4, 5, or 6". The jury assessed $500,000 in exemplary damages against each of the Appellants.

Appellants challenge the jury's responses to Question No. 8 in their sixth issue and summarily assert that "[w]ithout a showing of 'Negligence' [Hammad] is not entitled to a claim for Gross Negligence." We construe this challenge in conjunction with the argument raised in Appellants' third issue, in which they contend that the evidence is insufficient to show that Appellants owed Hammad a duty of care.

To establish liability for negligence, a plaintiff must prove the existence and violation of a duty owed to her by the defendant. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990); *Kukis v. Newman*, 123 S.W.3d 636, 639 (Tex. App.—Houston [14th Dist.] 2003, no pet.). The existence of a duty is a question of law for the court to decide from facts surrounding the occurrence in question. *Finley v. U-Haul Co. of Ariz.*, 246 S.W.3d 185, 187 (Tex. App.— Houston [14th Dist.] 2007, no pet.).

Each person has a general duty to exercise reasonable care to avoid a foreseeable risk of injury to others. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987), *superseded by statute on other grounds as stated in F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680 (Tex. 2007); *see also Aguirre v. Vasquez*, 225 S.W.3d 744, 757 (Tex. App.—Houston [14th Dist.] 2007, no pet.)

("To establish breach of a duty, the plaintiff must show either that the defendant did something an ordinarily prudent person exercising ordinary care would not have done under those circumstances, or that the defendant failed to do that which an ordinarily prudent person would have done in the exercise of ordinary care."). Here, Hammad alleges that Appellants owed her a duty to refrain from sexually assaulting her. Appellants do not cite any case law or other authority to support their argument against the imposition of this duty or to show that this would fall outside the duty of reasonable care. Based on the facts surrounding the occurrence in question, the trial court did not err in its legal conclusion that Appellants owed Hammad a duty of care.

We overrule Appellants' sixth issue challenging the jury's gross negligence finding.

### C.    Evidence That Appellants Drugged Hammad's Drink

In their first issue, Appellants assert Hammad "presented no evidence, or insufficient evidence that Appellants drugged her drink while at Belvedere."

The jury never made an express finding that Appellants drugged Hammad's drink. To the extent Appellants seek to challenge an implied finding, we conclude that this is not a threshold finding necessary to support the jury's responses to any of the submitted claims. *See Latham v. Burgher*, 320 S.W.3d 602, 606 n.1, 608-610 (Tex. App.—Dallas 2010, no pet.) (court considered the appellant's challenge to the jury's implied finding when the implied finding was necessary to support the jury's finding of alter ego). Therefore, we need not determine whether the evidence supports the finding that "Appellants drugged [Hammad's] drink while at Belvedere." We overrule Appellant's first issue.

## III.     Dr. Meixner's Conclusion That Hammad Has PTSD

In their fourth issue, Appellants summarily assert that "Dr. Meixner makes a conclusory statement about Mrs. Hammad having PTSD." Because Appellants did not raise this objection in the trial court or challenge the methodology underlying Dr. Meixner's conclusion, we limit our review of this issue to the face of the record. *See Arkoma Basin Expl. Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 388-89 (Tex. 2008).

If an expert provides no basis for her opinion, or if the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009). Conclusory or speculative opinion testimony "is not relevant evidence, because it does not tend to make the existence of a material fact more probable or less probable." *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (internal quotation marks omitted). When evaluating whether an expert's testimony is conclusory, we look to the entire record, not just to the expert's statements in isolation. *See Morrell v. Finke*, 184 S.W.3d 257, 279 (Tex. App.—Fort Worth 2005, pet. denied); *United Servs. Auto. Ass'n v. Croft*, 175 S.W.3d 457, 464 (Tex. App.—Dallas 2005, no pet.).

Here, Dr. Meixner provided an adequate basis to support her opinion that Hammad suffers from PTSD. Dr. Meixner testified that she has been a licensed psychiatrist for approximately 30 years and has treated "many" patients experiencing severe mental trauma and PTSD. Dr. Meixner said she visited with Hammad six-to-seven times and administered a PTSD checklist. To qualify for a PTSD diagnosis under the checklist, Dr. Meixner explained that a patient would need to exhibit six-to-seven of the listed symptoms, and that Hammad exhibited more than required. Describing some of these symptoms, Dr. Meixner said

15

Hammad was experiencing a depressed mood, memory problems, and an elevated fight-or-flight response. This testimony provided a basis sufficient to support Dr. Meixner's opinion that Hammad suffers from PTSD.

We overrule Appellants' fourth issue challenging Dr. Meixner's testimony.

## CONCLUSION

We overrule Appellants' seven issues on appeal and affirm the trial court's October 10, 2018 final judgment.

/s/    Meagan Hassan
           Justice

Panel consists of Justices Zimmerer, Spain, and Hassan.