**Arthur BRAWN and Gloria Brawn, Plaintiffs,**

v.

**FUJI HEAVY INDUSTRIES, LTD. and Subaru of America, Inc., Defendants.**

Civ. No. 91–296–P–H.

United States District Court, D. Maine.

Feb. 11, 1993.

Robert J. Stolt, David M. Lipman, Peter B. Bickerman, Lipman & Katz, P.A., Augusta, ME, for plaintiffs.

Robert H. Stier, Jr., Neal F. Pratt, Kenneth D. Pierce, Bernstein, Shur, Sawyer & Nelson, Portland, ME, for defendants.

**ORDER ON DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATING TO ANY INVERTED DROP TEST**

HORNBY, District Judge.

The plaintiff Gloria Brawn was severely injured when the 1987 Subaru XT in which she was riding as a passenger struck a moose in northern Maine, allegedly driving under the animal. She claims that the Subaru manufacturer should be liable on grounds of negligent design, strict liability and breach of warranty as a result of the failure of the Subaru roof to protect her from injury.

In preparing the case for trial, the plaintiffs' lawyers commissioned a so-called inverted drop test on another 1987 Subaru XT similar to Brawn's. In performing this test, their expert followed the procedures set forth in SAE J996.[1] The plaintiffs' expert

---

1. Society of Automotive Engineers (SAE) is an organization that publishes Standards, Recommended Practices and Information Reports primarily for those involved with the automotive industry's technical community. J996, as a Recommended Practice, documents "practice, procedures, and technology that [are] intended as [a guide] to standard engineering practice." Prep-

dropped the Subaru upside down from a height of 18 inches. The result was substantial roof crush, specifically 8½–9″. The plaintiffs would like to introduce as evidence at trial a videotape of that test and their expert's testimony concerning it. The defendants have moved to exclude it. After conducting an evidentiary hearing on January 25, 1993, pursuant to Fed.R.Evid. 104, I now make this ruling.

The Society of Automotive Engineers has adopted a number of procedures for testing cars. SAE J996 is the "Recommended Practice" to be followed if one wishes to drop a vehicle on its roof. The procedure specifies the terrain on which the car can be dropped, the covering over that terrain and the angle at which the car should be held upside down before it is released to fall on its roof. The procedure is designed to approximate what happens in a rollover, not a collision with a large animal. Although J996 specifies a method for conducting the test, it contains no performance standards. For example, it does not specify the height at which the car is to be dropped nor does it specify what degree of roof crush is acceptable at various heights. SAE J996 is only one of several procedures that have been used in the past two to three decades for testing how cars will perform when they roll over in an accident. (Other methods have included rolling a car down a hill; pushing it along on a dolly at a right angle and suddenly stopping the dolly so that the car rolls forward; a spiral track that leads the car to turn over; and a static procedure by which a force is applied to a roof pillar.)

Both parties agree that the inverted drop test is not intended in any way to simulate the accident that injured Gloria Brawn. Instead, the plaintiffs seek to introduce this evidence as independent proof that the roof of the Subaru was not reasonably safe. Although the test was developed to address only rollover concerns,[2] the plaintiffs argue that it will help the jury understand the issue of the roof's integrity for this accident as well. I conclude that evidence of the test should be excluded under Rules 701, 702 and 403 because it will not assist the jury in addressing the issues in this case but instead is likely to confuse or mislead it.

The videotape of the inverted drop test is a dramatic and slow-moving demonstration of the tremendous force and crush damage that occurs when the Subaru is dropped on its roof at a height of 18 inches. Under this procedure, the weight of the vehicle (approximately 2,600 pounds) impinges upon the front roof pillar at the point of impact and then spreads out in ways that engineers can best describe. There is no suggestion, however, that the Subaru vehicle weight approximates the weight of the moose that Mrs. Brawn's Subaru hit nor is there any evidence that the forces are at all comparable in that forward-moving collision and the drop test here.[3] All the test shows is that the occupant space in the Subaru is compromised severely when the car is subjected to the inverted drop test at a height of 18 inches. That result in itself, however, is of no assistance to the jury. The jury will already know, from seeing photographs of the actual Subaru in the accident and hearing the testimony of the witnesses, that the roof did collapse and that Mrs. Brawn was injured.

The only way the inverted drop test can be relevant is if there is a standard that a car should meet in such a test that this Subaru year and model fails to satisfy. By definition, however, SAE J996 is only a procedure and contains no standards. The closest that the plaintiffs can come to a standard is through the testimony of expert witness Dr. Malcolm Newman. He testified that, when the National Highway Traffic Safety Administration commissioned the development of a

---

aration of SAE Technical Reports—Surface Vehicles and Machines: Standards, Recommended Practices, Information Reports—SAE J1159 Jun 86. Defendants' Exhibit 5.

**2.** SAE J996 specifies that it is designed "to obtain as closely as possible deformation of a vehicle roof or roll bar structure *which occurs in a vehicle roll-over.*" The angles at which the car is

held upside down before dropping it are designed to produce "deformation similar to vehicle roll-overs." SAE J996, Defendants' Exhibit 2 (emphasis supplied).

**3.** The fact that after the moose impact the Brawns' Subaru *looked* somewhat like the Subaru that underwent the inverted drop test proves nothing.

so-called safety car in the early 1970's, it specified in its contract with Fairchild Hiller that to protect against *rollover* the safety car must permit only 3 inches of crush intrusion in a 2-foot drop following the procedures of SAE J996. The design of that safety car, however, was as a prototype not a production car. Moreover, the prototype was not able to meet that contract requirement (Fairchild Hiller estimated that its vehicle could meet the contract's 3-inch intrusion limitation from a drop of 1.5 feet) and Fairchild Hiller rejected the test as "unrepresentative of the rollover condition," resulting "in a severe ESV weight penalty" and "deficient in that it does not include occupant simulation, so that occupant/roof interaction is not determined." Defendants' Exhibit 10. Fairchild Hiller also concluded that the test overloaded one pillar and underloaded the remaining roof structure in its failure to reproduce the forward velocity and rotational motion of a rollover and proposed alternative tests as a better measure of rollover performance.[4] Dr. Newman himself still prefers "a series of dolly rollover tests" over the inverted drop test.

Dr. Newman also agrees that there are no written standards adopted by the engineering community concerning an acceptable amount of intrusion into the passenger compartment, but he did testify that "right now everybody is talking about three to four inches...." Dr. Newman testified:

> A I'm not a rebel, it's not the Malcolm Newman standard, I'm a member of a community of safety engineers that does this kind of work, and we interact with each other. Back in 1970, we had this starting point with the Federal Motor— with the experimental safety vehicle, the standard is to achieve three to four inches, maximum four inches of crush, at a—at a two foot drop height, that's the kind of thing that is generally accepted, and it's not a Malcolm Newman standard, *it's just what I know it to be.*[5]

> Q Well, the only other standard that you've told us about is the standard that applied to the experimental safety vehicle, and that was three inches of crush or less, from a drop height of two feet; is that right?

> A That was the standard written into the contract initially, yes.

> Q Right. Now where is the standard of no more than four inches of crush from a drop height of two feet written?

> A It isn't. I just said that, it is not, but that is the yardstick that we use.

(Emphasis supplied.) In the absence of anything more specific than Dr. Newman's "it's just what I know it to be," I find this testimony unpersuasive that any scientific community has adopted the inverted drop test at a height of 18 inches with a maximum intrusion of 3 to 4 inches as a standard for evaluating the integrity of a car's roof structure. (Plaintiffs' expert Peterson testified that 18 inches "over the years" has become the generally accepted height from which to drop a vehicle in an inverted drop test but also appeared to believe (incorrectly) that 18 inches was specified in the original safety vehicle contract.) Dr. Newman later testified that there is no standard for determining at what level of crush a roof becomes defective.

There was also no competent evidence presented on the use of this test by manufacturers as a means of assessing roof strength. On the one hand, the defendants' expert witness Carmody testified that he knows of no manufacturer to use it during the last 20 years for passenger cars or light trucks. That, of course, is not the same as a statement that no one *has* used it. On the other hand, the plaintiffs' expert witness Peterson testified that he believes Mercedes and several other European manufacturers use the test, but admitted on cross-examination that his testimony is based simply on what he was told by a Mercedes dealer who told him that

---

4. SAE J996 itself states:
   The drop test is a severe test since the majority of the kinetic energy is applied to one side of the roof structure, over a windshield support pillar. This is contrasted to a roll-over in which there is a progressive dissipation of energy by various parts of the vehicle, including *wheels, bumpers, fenders and the roof structure.*

5. As I observed earlier, however, even the prototype safety vehicle could not reach this standard.

he had once seen a tape of a Mercedes vehicle being dropped on its roof. Peterson, in fact, has nothing in his possession concerning use of the test by other European manufacturers and the unidentified test as related by the Mercedes dealer obviously furnishes very little reliable foundation for his conclusion. The plaintiffs' expert Newman likewise testified only that he was "told" that Volvo, Mercedes and Saab used the test but that he had nothing in writing. Collectively this is all very unsatisfactory evidence concerning the use of the test. The only affirmative proof is that the test is sometimes used in litigation.

It is the plaintiffs' burden to establish a foundation for the admissibility of this evidence. I am not satisfied that J996 is an acceptable test for evaluating general roof strength of a passenger car. The plaintiffs have failed to show that there is any generally accepted use of this test or any generally accepted standard of performance for this test against which the Subaru's performance could be measured so that the jury might conclude that it failed to meet that standard. Witness Newman's testimony concerning an unwritten general consensus of the permitted degree of intrusion and Witness Peterson's testimony concerning a standard drop height being reached "over the years" are simply evanescent in the absence of any written standards or any reference to particular engineers or manufacturers or others who have adopted such a standard. I recognize that plaintiffs generally should not be prevented from making a case that a car is unsafe by the failure of manufacturers to develop a test to show the lack of safety, but the plaintiffs' experts have produced no satisfactory explanation for how the inverted drop at 18 inches shows that the Subaru is negligently designed, in breach of warranty, or defective.

I conclude that there is a high likelihood that the jury would be substantially affected by viewing the dramatic impact of the crush occurring as a vehicle is dropped on its roof from a height of 18 inches without gaining any significant understanding concerning what is a safe roof integrity against which to measure what happened in the Brawns' moose collision.[6] Accordingly, the motion to exclude the evidence is GRANTED under Fed.R.Evid. 403, 701–02.[7]

I conclude for the same reasons that any evidence concerning the defendants' testing under FMVSS 216 should likewise be excluded if the defendants seek to offer it. (The defendants conceded as much at oral argument.) FMVSS 216, too, is designed only for evaluation of rollover protection [8] and does not purport to test header strength, one of the major issues in this case. FMVSS 216 would mislead the jury just as the inverted drop test would. The defendants may be able to introduce evidence that they have complied with all federal motor vehicle safety standards (if that is the case), but my current understanding of the law at this stage of the proceedings is that I would proceed to instruct the jury that such compliance does not excuse the defendants from liability under state common law and statutory standards.

SO ORDERED.

**6.** I am aware that in *Shipp v. General Motors Corp.*, 750 F.2d 418 (5th Cir.1985), the Court of Appeals upheld the introduction into evidence of such a drop test. Its ruling, however, was that it was not an abuse of discretion for a trial court to admit the test in connection with a rollover accident. For the reasons I have outlined in text, I believe it is a sound exercise of discretion to exclude the test here. In *Harvey v. General Motors Corp.*, 873 F.2d 1343 (10th Cir.1989), the Tenth Circuit found no abuse of discretion in admitting certain videotape rollovers. Those were introduced, however, for the limited purpose of showing the general principles of vehicle dynamics and occupant kinematics in a rollover.

No such purpose is proposed for the SAE J996 test discussed here.

**7.** Witness Peterson's inconsistent deposition testimony on whether he had done such a test for any other moose-vehicle crash does not affect my ruling. That is a matter, if at all, for cross-examination going to credibility.

**8.** The similar SAE Recommended Practice, SAE J374, specifies that its purpose is "to evaluate the strength characteristics of passenger car roof systems under loading conditions simulating vehicle rollover."