

# NUMBER 13-17-00431-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

## ESTATE OF W.R. DURRILL, DECEASED

---

**On appeal from the County Court at Law No. 3
of Nueces County, Texas.**

---

# O P I N I O N

**Before Chief Justice Contreras and Justices Rodriguez and Benavides[1]
Opinion by Justice Benavides**

Appellant Georgeanne Costello Gasaway Durrill (Gasaway)[2] appeals from a

judgment that voided her alleged marriage to William R. "Dusty" Durrill. The trial court's

judgment resulted from a partial directed verdict and jury verdict in favor of appellees,

---

[1] The Honorable Nelda V. Rodriguez, former Justice of this Court, did not participate in this decision because her term of office expired on December 31, 2018.

[2] The Court refers to appellant by the name Gasaway to avoid confusion. Many of the witnesses in the case are named Durrill and they will be referred to by their relationship to the deceased or by their first name.

Durrill's children.[3]   After Durrill's death, his children sued to void the marriage pursuant to chapter 123 of the estates code.   *See* TEX. EST. CODE ANN. Ch. 123 (West, Westlaw through 2017 1st C.S.).

Gasaway's first issue complains that the children did not obtain a finding on a mandatory element of their claim: that the marriage was commenced no earlier than three years before Durrill's death.   *See id.* § 123.102(a)(2).   By her second issue, Gasaway contends that the Declaration of Marriage and Registration of Informal Marriage (Declaration) she and Durrill filed is prima facie evidence of the marriage and the marriage is therefore presumed valid on January 22, 2010.   Gasaway's third issue argues that the codicil to Durrill's will in favor of Gasaway was concealed by Durrill's lawyer which gives rise to a presumption or inference of marriage.   Gasaway's fourth and fifth issues complain that the trial court reversibly erred by refusing her proposed jury charge instructions regarding the presumed validity of marriage and the effect of the Declaration as proof of a marriage.

We affirm.[4]

## I.   BACKGROUND

On November 2, 2015, Durrill and Gasaway filed the Declaration stating that they had been informally married since January 22, 2010.   Durrill died on April 8, 2016, at the age of 82 from natural causes.

---

[3] William R. Durrill, Jr. (Bill Jr.), Melissa Holtz (Holtz), Michelle Durrill (Mickey), and Ginger Durrill (Ginger).

[4] The parties filed a joint motion requesting that this Court address whether the judgment was a final appealable order.   We hereby grant the motion and discuss the issue herein.

2

The Durrill children filed an application to probate Durrill's 2004 will and then learned that Durrill had also executed a 2014 codicil that granted Gasaway a twenty percent interest in some assets of Durrill's estate, a life estate in Durrill's house and furnishings, as well as ownership of funeral plots next to him. The children amended their application to probate the will to include the codicil on May 2, 2016, the same day the codicil was filed in the probate proceedings.

Within the probate proceeding, the children filed an application pursuant to section 123.102 of the estates code to declare Durrill's and Gasaway's marriage void claiming he did not have the mental capacity to enter a marriage. *See id.* § 123.102. The jury heard the evidence discussed in the following pages.

## A. William R. Durrill

Durrill was a prominent businessman in Corpus Christi who had multiple business ventures throughout the city and the local areas. He also created a charitable foundation that contributed to the beautification of the City. Durrill's wife of fifty years and the mother of his children died in 2008 after a lengthy illness. Durrill began living with Gasaway in 2009.

The Durrill businesses included ventures owned by Durrill alone or with outside partners, with some or all of his adult children, and ventures owned by the children, some with and some without outside partners or investors. Bill Jr. was the general manager of Durrill Properties which managed the businesses which included restaurants, concert venues, retail, and real estate. Durrill Properties was also used to operate the Devary

3

Durrill Foundation (Foundation),[5] which was named after Durrill's eldest daughter who died in 1977.

Durrill remained active in his businesses until after his wife died in 2008. In 2009, Durrill signed a general power of attorney in favor of Bill Jr. that gave him the right to transact business on Durrill's behalf. Durrill was less and less involved in the businesses after 2009.

Durrill had various chronic health problems by 2009. The most serious were a cardiac condition, significant osteoarthritis in multiple joints that caused him pain, and cirrhosis of the liver. Durrill also had severe hearing loss.

In 2010, Donna Kelly, who was the controller for all the Durrill businesses and dealt with Durrill on a near daily basis from 1983 until 2013, noticed that Durrill was beginning to "slip" mentally. Among other things, she noticed that Durrill could no longer read financial statements.

In 2011, Durrill came into the office and advised the staff that he was no longer going to be coming into the office daily and that Bill Jr. was in charge. By then, Bill Jr. was running the businesses, but he testified that he still tried to involve Durrill. Durrill signed a statutory durable power of attorney on September 14, 2014, giving Bill Jr. the right to make decisions for Durrill in all matters.

In late 2012, the seventy-eight-year-old Durrill had a severe stroke and was hospitalized. After two weeks of local hospitalization, he was transferred to a

---

[5] Durrill's adult children were the directors of the Foundation. Bill Jr. became president of the Foundation in 2007. Durrill continued to participate in the Foundation after 2007 but was no longer on the board of directors.

4

rehabilitation facility in Houston where he remained for approximately one month. He was then transferred to a Houston hospital for placement of two cardiac stents. When Durrill returned home, he had left side hemiparesis which impaired his ability to walk, his speech was impaired, and he needed on-going care and therapy. Durrill was first diagnosed with congestive heart disease in 2012 after his stroke.

By September 2015, Durrill needed in-home care. Frances Mir, R.N., coordinated the planning for day-time care givers for Durrill. By October 29, 2015, caregivers were ordered twenty-four hours a day. Durrill needed help for nearly all activities of daily living.

By December 2015, Durrill had significant difficulty leaving home and could not do so alone. The effort was "significant and taxing" due to his shortness of breath on exertion. That month, Durrill was also diagnosed with atrial fibrillation.

By January 2016, Durrill required intermittent skilled nursing care in addition to care givers. Durrill was generally weak, lacked energy, and was not sleeping well by March 2016. According to Dr. Mark Dodson, Durrill's primary care physician, Durrill was just "gradually deteriorating with multiple organs starting to go out" and he "was just kind of heading down hill." By this time, Durrill was spending most of his days in bed.

Durrill was admitted to the hospital on April 6, 2016, for kidney failure and dehydration. He died the morning of April 8, 2016.

B.     **Evidence of Durrill's Cognitive Function and Mental Lapses**

At trial, the two primary issues were Durrill's mental capacity to execute the Declaration in November 2015 and whether the parties had entered into an informal

marriage before the Declaration.[6]   The trial court heard from both lay and expert witnesses about Durrill's mental capacity.

### 1.  Dr. David Sutter (primary care physician)

David Sutter, M.D., was Durrill's physician for many years before 2012.   In July 2012 during his physical, Durrill admitted to Dr. Sutter that his memory was declining but Durrill refused a mental status exam.   Durrill changed primary care physicians to Dr. Dodson late in 2012, before his stroke.

### 2.  Donna Kelly (business associate)

Kelly testified that Durrill had always loved to buy and sell cars.   In the summer of 2013, Durrill called Kelly and told her to wire $12,500 to an internet site for a car.   Kelly wanted to confirm that the site was valid before sending the bank wire, but Durrill insisted she send the wire immediately so he would not lose the car.   Within fifteen minutes, but after the wire went through, Kelly's assistant confirmed that the website was fraudulent, but it was too late to recover the money.   According to Kelly, Durrill would not have acted so impulsively in the past.

Before 2014, Durrill had been working on estate planning with Julie Buckley, Durrill's accountant, and Kelly.   Kelly talked to Durrill about which assets to transfer to a trust set up for his grandchildren.   By November 1, 2015, Kelly was concerned that Durrill did not understand the assets he owned.   Although Durrill had previously been familiar with all thirty-five Durrill entities and their functions, by 2015 he could not identify them.

---

[6] In August 2015, before Durrill died, there was a separate legal dispute over Durrill's competency to grant a power of attorney to Gasaway.   The litigation that ensued between the parties began after the children applied for a temporary guardianship for Durrill.

In December 2015, Durrill came to Durrill Properties to "fire everyone." While Durrill was there, Mickey, Bill Jr., and Kelly sat with him and showed Durrill photos from Durrill's office. One of the photos was taken when Durrill was in the military. Kelly asked Durrill about the photo and he identified the uniformed soldier as one of Bill Jr.'s sons; he did not recognize himself.

### 3. Dr. Mark Dodson (primary care physician)

Beginning in 2013, Dr. Dodson performed several mini-mental status exams at Durrill's request.[7] According to Dr. Dodson's 2015 medical records, Durrill had severe hearing loss. Even with hearing aids, Durrill had substantial difficulty with the tests. According to Dr. Dodson, Durrill was mentally competent in August 2015. Dr. Dodson further attested that Durrill saw him in early November 2015 to obtain clearance for dental surgery. At that time, Dr. Dodson noted that Durrill had appropriate affect and demeanor, a slow speech pattern which was normal for Durrill since his stroke, and normal thought and perception.

### 4. Melissa Holtz (daughter)

Holtz, the youngest of Durrill's children described her relationship with her father and siblings as close. She and her father talked on the phone and emailed regularly until the last year or two of his life. In the summer of 2015, Holtz had a conversation with Durrill in which he did not recall Holtz's husband's or son's names and did not remember that Holtz's husband was deployed to Afghanistan even though Holtz and her father had

---

[7] Durrill was tested on April 16, 2013 and he scored 28 out of a maximum of 30. He was tested again on April 15, 2015 and scored 24. His last test by Dr. Dodson was on August 11, 2015, and he scored a 27. A score between 20 to 26 indicates reason for concern that the patient is "beginning to have memory issues and cognitive issues" according to Dr. Dodson at trial.

talked about her husband's deployment many times before. That same summer, Durrill telephoned Holtz, and while they were talking, he asked her for Sissa Ann's phone number. Sissa Ann is one of Holtz's family nicknames

### 5. Bill Jr. (son and business associate)

Bill Jr. was given authority to transact business on behalf of the Foundation by a 2009 resolution of the Foundation's board of directors. However, in 2015, Durrill claimed he was president for life of the Foundation, though at the time documents filed with the Texas Secretary of State reflect that Durrill was not even a member of the board of directors.

Also, in the summer of 2015, Durrill met with Jerry Setliff, a business associate with whom the Durrills were involved in over nine different partnerships.[8] Bill Jr. and Robert Anderson, Durrill's business attorney, had been working on a sale of the partnerships and had been discussing the negotiations with Durrill. Bill Jr. testified that he was concerned that his father no longer understood the extent of their involvement with the Setliffs, the amount of debt, the cash flow issues, and the complexity of the transaction.

### 6. Robert Anderson (business attorney)

Anderson was also very concerned about Durrill's mental capacity by the summer of 2015. During the negotiations for the sale of the Durrill interests in the Setliff/Durrill partnerships, Setliff went to Durrill's house and convinced Durrill to sign off on a document relating to the sale of the Durrill interests, even though Durrill could not sell Bill Jr.'s

---

[8] The ownership of the Setliff/Durrill entities was divided as follows: 25% each to Durrill and Bill Jr., 25% to Setliff and 25% to Setilff's brother.

interest. Although Anderson had been discussing the negotiations with Durrill, Durrill signed an agreement with Setliff that Anderson had not reviewed. Durrill told Anderson that he could take that document to Frost Bank and get $2 million for it. Instead, the document was an effort by Setliff to take over the transaction for the partnerships. After he discussed it with Durrill, Anderson stopped the attempted transaction with Setliff by calling the bank and by withdrawing Durrill's approval. By 2015, Durrill almost never came to the Durrill Properties' office, even when he was invited to meetings.

### 7. Michael Lee (attorney)

Attorney Michael Lee was hired to represent Durrill on February 1, 2016, after Durrill terminated his relationship with other attorneys. He had not met Durrill before that date. Lee was originally approached by one of Gasaway's attorneys to be local counsel although that did not occur.

Any sale of Durrill's assets after the temporary guardianship was filed in 2015 had to be approved by the temporary guardian and his counsel. Lee was tasked with reviewing financial records regarding the sale of the Setliff partnerships and the sale of a Kingsville shopping mall. Lee was also hired to assist Durrill in the guardianship litigation regarding Durrill's competence and whether a permanent guardian should be appointed. Lee testified that he reviewed the Setliff transaction with Durrill and had the impression that Durrill understood the transaction.

Lee reviewed the documents regarding the sale of the Kingsville shopping mall in late February or early March 2016 with Durrill. Durrill had a concern about that sale, although Lee did not understand his concern because Durrill's speech was impaired from

9

his stroke. After talking with Durrill's accountant, Lee determined that there was some property behind the mall that had buffle grass and Durrill wanted to exclude that part of the property from the sale. Once Durrill was satisfied that the property with buffle grass was not part of the transaction, he approved the sale.

Durrill understood he was in litigation with his children and did not like it. Lee testified that he believed Durrill understood what Lee told him and recommended.

### 8. Loyd Neal (Friend)

Loyd Neal, the former county judge for Nueces County, testified that he had known Durrill for fifty years at the time of Durrill's death. Neal knew Durrill through his insurance business. Neal and his wife used to socialize with Durrill and his deceased wife. Neal and his wife attended a reception at Durrill's home on November 14, 2015 at which Durrill told him that he had gotten married. Neal believed that Durrill understood their conversation. Neal was at Durrill's house for about an hour with a few other couples.

### 9. Durrill's Conduct

On November 9, 2015, Durrill sent an email to a Durrill Properties' employee, Mark Schaberg, with the subject, "Party at my home" and the text read as follows: "M marrying oyd andmarrying Loyd Neal & Sheriff Caelin/. Come on over!! About 500.OOpm.. .0." A subsequent email to Schaberg, who was in charge of booking music for Durrill's entertainment venues, asked Schaberg to provide quiet music for the reception at Durrill's house on November 14, 2015.

On November 30, 2015, Durrill sent an email to Kelly, advising her that her employment was terminated effective that day and any questions could be directed to his

attorney Steve Lopez.   Kelly testified that she no longer worked for Durrill on that date; she worked for Bill Jr.

Durrill went to the Durrill Properties office on December 15, 2015, with two caregivers, a county sheriff's deputy, and a locksmith.   Bill Jr. and Mickey were present along with the office staff.   Durrill announced that they all had to leave the building and said, "[y]ou're all fired."   Durrill announced that he was evicting them from Durrill Properties and changing the locks.   Kelly asked Durrill if he remembered that he gifted the building to his grandchildren.   Durrill responded, "If I did I did."   Durrill made no further effort to evict Durrill Properties.

### 10.  Psychological Testing

Durrill was tested in September 2015 and in February 2016 by two different neuropsychologists to determine his mental functioning.   According to the children's expert witness Bennett Blum, M.D., the testing revealed that Durrill had "cognitive problems that would have severely impacted his mental capacity."   Dr. Blum, a psychiatrist with subspecialty training in geriatric and forensic psychiatry, did no testing but relied on the testing performed in 2015 and 2016 by the neuropsychologists.   Dr. Blum never met Durrill.

Douglas Cooper, Ph.D., performed the first neuropsychological examination on Durrill at the request of Durrill's lawyers in 2015.[9]   He also performed the same mini-mental status exam that Dr. Dodson previously administered to Durrill.   On September

---

[9] The testing was performed while temporary guardianship proceedings were pending in Nueces County Court at Law No. 5.   That proceeding was initiated by Durrill's children in 2015.   Although Dr. Blum relied on Dr. Cooper's testing, Dr. Cooper did not testify at trial the trial in this case.

11

17, 2015, during Dr. Cooper's testing, Durrill scored a 21. Dr. Dodson administered the same test a month earlier and Durrill scored a 27, but there was some evidence that Gasaway coached Durrill before Dr. Dodson's testing.

Dr. Blum testified that the mini-mental status exam was developed to screen for the presence of various cognitive problems and to help assess the progression of certain types of dementia. He also testified that the test does not address executive function of the brain based upon studies conducted by the developer of the mini-mental status exam and others. Executive functioning is the ability to plan, analyze, and adapt to ongoing conditions; such functioning requires more than simply an intact memory but also engages higher-level brain functions.

Based upon Dr. Cooper's testing, Dr. Blum concluded that Durrill had severe cognitive problems on September 17, 2015 that would have severely affected his mental capacity. According to Dr. Cooper's records, Durrill was not fully oriented to place or time; his speech was disinhibited at times; and his expressive language was disorganized and not fully comprehensible. Dr. Cooper's testing reflected that Durrill's executive functioning was in the bottom percentile, like that of an eight-year-old child. Although Durrill's long term memory was intact, his working memory was poor, which comported with his performance on tests of his executive function. Dr. Blum testified that on November 2, 2015, Durrill "had such severe cognitive impairment that he could not have understood the document that he was executing nor, would he have understood even the concept of marriage beyond that of what would be expected of . . . a child of eight."

Gilbert Martinez, Ph.D., another neuropsychologist, performed additional

neuropsychological testing on Durrill in February 2016 while various litigation was pending, including the guardianship proceedings.[10]  Dr. Blum testified that Durrill's test results in 2016 were very similar to those in September 2015 and again showed that his executive functioning was severely impaired, and he suffered from diminished mental capacity.

Dr. Blum further testified that someone with Durrill's limited capacity could be unduly influenced or manipulated by someone else and he saw evidence of those risk factors in Durrill's case.   The risk factors Dr. Blum described were: 1) physical weakness or illness; 2) cognitive problems; 3) vulnerability in his relationship with Gasaway; 4) isolation from family, outside information, or pertinent advisors; 5) dependence for physical care, emotional support, and information; 6) emotional manipulation or exploitation; 7) acquiescence; and 8) loss or harm to the impaired person.

## C.    Gasaway and Durrill

Gasaway lived with Durrill from 2009 until he died.   According to Gasaway, Durrill was fully competent until he died, and continued to actively run his businesses until at least 2015.   She further testified that she and Durrill believed that Bill Jr. was trying to take over the businesses and the Foundation by having Durrill declared incompetent.   At the time of Durrill's death, Gasaway was approximately fifty years old.

### 1.  Durrill's Children's Testimony

Bill Jr. thought Gasaway came into Durrill's life as early as 2002.   Holtz recalls seeing Gasaway at the Durrill house after Durrill's wife died.

---

[10] Dr. Martinez did not testify at the trial in this case.

At the time of Durrill's stroke in November 2012, according to Bill Jr., Gasaway took legal documents with a notary to Durrill in the ICU, but Durrill's accountant and long-time friend Julie Buckly prevented Durrill from signing anything. Bill Jr. was on a cruise with his family when Durrill was hospitalized and Anderson was also unavailable because he had a major heart attack.

On August 7, 2015, Durrill signed a power of attorney in favor of Gasaway that revoked all other powers of attorney. Anderson was out of town at the time. Later that month, the children filed an application for temporary guardianship over Durrill and an application for a temporary restraining order as to Gasaway.[11]

In the summer of 2015, none of the children saw Durrill although they all called regularly and left messages.

On October 29, 2015, Bill Jr. went to see Durrill for a prearranged visit. Bill Jr. brought lunch for Durrill and the aides. He sat on the coffee table across from his father and tried to talk with him about the pending sale of the Wildhorse Mall in Kingsville. One

---

[11] The petition for temporary guardianship sought an independent medical examination and to name Bill Jr. as guardian. Bill Jr. testified that he filed the suit to avoid the power of attorney Durrill granted to Gasaway earlier that month and to prevent her from attempting to run the Durrill businesses. Durrill was represented in that litigation by Steve Lopez and Amanda Torres. The Durrill children owned several businesses and they, the Foundation, and Ginger sued Gasaway on August 18, 2015 seeking a temporary restraining order and injunction. Ginger had separately invested in Gasaway's sign company.

Durrill filed suit against Bill Jr. seeking a temporary restraining order and a temporary and permanent injunction. The object of Durrill's suit was to restrain Bill Jr. from accessing any of Durrill's businesses; from making any statements about Durrill's mental capacity; from communicating with any professionals employed by Durrill, including bookkeepers, accountants, attorneys or physicians; from communicating with any employees or any entity or business owned by Durrill; from accessing or withdrawing funds; from authorizing payment on any account of Durrill's or of any entity or business owned or controlled by Durrill; and from exercising any control over assets or property belonging to Durrill. Durrill also sued for money damages for breach of fiduciary duty and slander. He was represented by Steve Lopez.

In December 2015, Gasaway sued Darla, a company that belonged to the children, seeking reentry to Gasaway's business warehouse after she was locked out for nonpayment of rent.

of the aides characterized Bill Jr. as yelling but Bill Jr. testified he was speaking loudly so that his father could hear him. The aide asked Durrill if he wanted to continue the visit and he said "no." The aide asked Bill Jr. to leave, and he did so reluctantly. Bill Jr. was angry at the termination of the visit and expressed his frustration. Later that day, Durrill's attorney Amanda Torres unilaterally terminated visits by any of the children after that date with the excuse that the visit caused Durrill's blood pressure to plummet, although it had been lower on other occasions when Bill Jr. was not present. The Monday after Bill Jr.'s visit, Durrill and Gasaway executed the Declaration.

Holtz made arrangements to visit Durrill with her sons around Christmas 2015, but when she arrived, no one would answer the door or the telephone even though the cars were at the house and she could see people through the windows. A day or two later, after involving the attorneys, Holtz and her children were allowed to see Durrill with her sister Ginger.

### 2. Gasaway's Business

Gasaway owned a sign company that she formed in 2010 with a $250,000 loan guaranteed by Durrill. In 2010, Durrill loaned her approximately $100,000, according to Kelly who wrote the check at Durrill's instruction. Gasaway leased warehouse space from one of the Durrill Properties companies and sold signage to several businesses managed by Durrill Properties. Gasaway's son Eric was an employee of Gasaway's sign company. Eric testified that there was a period when his mother would pay him and another employee their weekly salary with gift cards. On approximately ten occasions, Gasaway bought the gift cards at the grocery store using Durrill's American Express or

15

other credit cards.

### 3. Donna Kelly

On August 5, 2015, Kelly notified Gasaway that there were over $31,000 in charges on Durrill's American Express card authorized by Gasaway and in a later email that day, Kelly asked Gasaway for copies of the receipts. Before that, Gasaway had been using Durrill's other credit cards, but Gasaway had exceeded their limits of $25,000. The charges were for supplies for Gasaway's sign company, airline tickets for her daughter, and various other things.

### 4. Georgeanne Gasaway

By 2014, Gasaway chained and locked the back gate to the house. None of the family members had a key; only Gasaway, Eric, and the pool man had keys. According to Gasaway, Durrill had a gate camera installed. When Gasaway and Durrill were home, the gate was generally chained and locked. Sometime in 2015, they put a camera on the front porch, so they could see who was at the door.

In June 2014, Gasaway sent Durrill an email confirming an appointment with the Gonzalez & Gonzalez law firm so Durrill could move all his business affairs to that firm.[12] Durrill responded stating, "I am NOT moving ALL my business to their firm." (emphasis in original). According to Gasaway, the original email to Durrill was designed to determine who was reading Durrill's email and there was never any intent to move the business.

Gasaway acknowledged that during the summer of 2015, there were efforts to

---

[12] Arnold Gonzalez, a Corpus Christi attorney, was Durrill's roommate during part of the time Durrill was at the rehabilitation hospital in November and December 2012. Steve Lopez, a lawyer with the Corpus Christi firm of Gonzalez & Gonzalez is Gonzalez's brother-in-law.

terminate Durrill's relationships with Anderson, who had been Durrill's attorney for thirty years, Kelly, and others employed at Durrill Properties who had been with him for many years. Gasaway instructed the caregivers not to answer the telephone unless Durrill asked them to and instructed them not to answer the door. There is conflicting evidence as to whether the phone was turned down so Durrill could not hear it, and whether he was deprived of his hearing aids.

Gasaway drove Durrill to San Antonio for testing with Dr. Cooper in September 2015. The next day, on September 18, 2015, there was a hearing in the guardianship matter, but Durrill was not present because he was at the emergency room.

After mediation in October 2015, there was an agreement between the children, Durrill's attorneys, and Gasaway, that Gasaway would relinquish the power of attorney Durrill gave her in August 2015 and Kelly would be granted the medical power of attorney. There was also an agreement that each of the children could visit Durrill weekly for an hour and could bring their children during the visit without Gasaway's presence. After Bill Jr.'s visit on October 29, 2015, Durrill's attorneys reneged on the mediation agreement for visitation.

On November 14, 2015, Gasaway and Durrill had a small reception at Durrill's home that did not include any of Durrill's family. Over the remaining five and a half months of Durrill's life, he was mostly home-bound other than trips to Gasaway's office or for medical care.

## D. Trial Court

After Durrill died and the applications to probate his will and the codicil were filed,

Durrill's children filed a petition to void Durrill's alleged marriage to Gasaway based upon Durrill's mental incapacity. After a two-week jury trial, the trial court granted a directed verdict in favor of Durrill's children that no informal marriage existed between Gasaway and Durrill before November 2, 2015. The jury then found that Durrill did not have the mental capacity to enter a marriage on November 2, 2015 and did not thereafter gain the mental capacity to recognize a marriage relationship. Based on the directed verdict and the jury's findings, the judgment voided the Declaration that Durrill and Gasaway signed.[13] This appeal followed.

## II. JURISDICTION

As a general rule, appeals may be taken only from final judgments. *De Ayala v. Mackie*, 193 S.W.3d 575, 578 (Tex. 2006) (citing *Lehmann v. Har–Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001)). "Probate proceedings are an exception to the 'one final judgment' rule; in such cases, 'multiple judgments final for purposes of appeal can be rendered on certain discrete issues.'" *Id.* The need to review "controlling, intermediate decisions before an error can harm later phases of the proceeding" has been held to justify this rule. *Id.* (citing *Logan v. McDaniel*, 21 S.W.3d 683, 688 (Tex. App.—Austin 2000, pet. denied)).

The estates code provides that, "[a] final order issued by a probate court is appealable to the court of appeals," and provides that the entire probate proceeding from application to probate until distribution and discharge is a single proceeding for purposes

---

[13] Gasaway filed a motion for new trial and a motion to correct, modify, or to reform the judgment. The motion for new trial was based upon claims of factual insufficiency and challenged the trial court's partial directed verdict. In addition, the motion raised the omission of a finding that the marriage occurred less than three years before Durrill's death. The motion to modify or reform the judgment attacked the legal sufficiency of the evidence. The trial court heard argument on the motions and subsequently denied them both by written orders dated October 11, 2017.

of jurisdiction *in rem*. TEX. EST. CODE ANN. § 32.001(c), (d) (West, Westlaw through 2017 1st C.S.). The supreme court has adopted the following test for assessing whether a judgment is final for purposes of probate appeals:

> If there is an express statute, such as the one for the complete heirship judgment, declaring the phase of the probate proceedings to be final and appealable, that statute controls. Otherwise, if there is a proceeding of which the order in question may logically be considered a part, but one or more pleadings also part of that proceeding raise issues or parties not disposed of, then the probate order is interlocutory. For appellate purposes, it may be made final by a severance order, if it meets the severance criteria, as did the order in the present case. In setting this standard, we are mindful of our policy to avoid constructions that defeat bona fide attempts to appeal.

*Crowson v. Wakeham*, 897 S.W.2d 779, 783 (Tex. 1995).

Here, the judgment before us was rendered after a jury trial in which the sole issue was the validity of Gasaway's marriage to Durrill. The judgment voided the marriage and disposed of Gasaway's claim as a spouse to the Durrill estate. The trial court made clear by two separate orders that it intended that the judgment be separately appealable. *See Churchill v. Mayo*, 224 S.W.3d 340, 345 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (holding that an order to partition and sell a widow's homestead land in probate was a final and appealable order); *Estate of Wright*, 676 S.W.2d 161, 163 (Tex. App.—Corpus Christi 1984, writ ref'd n.r.e.) (holding "an order is appealable if it finally adjudicates some substantial right . . . if it merely leads to further hearings on the same issue, it is interlocutory."); *see also In re O'Neil*, No. 04-11-00587-CV, 2012 WL 3776490, at *3 (Tex. App.—San Antonio, Aug. 31, 2012, no pet.) (mem. op.) (holding summary judgment that disposed of decedent's testamentary capacity was an appealable final

19

judgment). The remaining separate proceedings involve the probate of Durrill's complicated estate.

Chapter 123 of the estates code establishes a procedure to declare certain marriages void after the death of one spouse. *See* TEX. EST. CODE ANN. ch. 123. If a marriage is declared void pursuant to section 123.102, the other party "is not considered the decedent's surviving spouse for purposes of any law of this state." *Id.* § 123.104. Chapter 123 does not specify whether such orders are interlocutory or final; however, an order pursuant to such a proceeding finally determines the party's status as an heir. *Id.* Historically, the determination of the interest of a party in an estate was tried separately before the trial of issues affecting the validity of the will. *Womble v. Atkins*, 331 S.W.2d 294, 298 (Tex. 1960) (holding "[a] judgment of no interest and consequent dismissal of an application for probate, or contest of, a will is in no sense interlocutory. . . . [T]he judgment is a final judgment."); *but see Fischer v. Williams*, 331 S.W.2d 210 (Tex. 1960) (holding that because "the order overruling respondents' motion to dismiss failed to finally dispose of the controverted issue, it [was] no more than an interlocutory order . . . made in the progress of the trial, and, therefore, not appealable.").

The trial court intended the judgment to be final because it resolved Gasaway's claim to inherit as a spouse which would facilitate the final disposition of the estate in separate proceedings. The judgment also meets the tests in *Crowson* and in *Lehman* that "[a] judgment that finally disposes of all remaining parties and claims, based on the record in the case, is final . . . ." 897 S.W.2d at 783; 39 S.W.3d at 200. Accordingly, we hold that we have jurisdiction. The parties' joint motion is granted.

20

### III. DIRECTED VERDICT

By her second issue which we address first, Gasaway challenges the trial court's granting of a directed verdict that there was no common-law marriage before November 2, 2015. Gasaway argues that the Declaration itself constituted probative evidence of an informal marriage and that the trial court ignored the presumption that marriages are valid. As a result, Gasaway contended that the children could not conclusively establish that there was no common-law marriage.

### A. Standard of Review

We review the trial court's grant of instructed verdict *de novo*. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). A directed verdict is proper when the evidence conclusively proves a fact that establishes a party's right to judgment as a matter of law. *See id.* at 816; *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989); *see also Jones v. Hand*, No. 13-12-00647-CV, 2014 WL 1007875, at *2 (Tex. App.—Corpus Christi Mar. 13, 2014, no pet.) (mem. op.).

To prevail at trial, the children had the burden to negate the existence of an informal marriage. If the evidence supporting a finding of informal marriage "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions," it constitutes more than a scintilla of evidence and the case must be reversed and remanded for a jury determination. *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). We review the evidence in the light most favorable to the non-movant, credit evidence a reasonable juror could credit, and disregard contrary evidence and

21

inferences unless a reasonable juror could not. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018); *City of Keller*, 168 S.W.3d at 827–28.

**B.  Applicable Law**

An informal or "common-law" marriage may be proved,

(a) In a judicial, administrative, or other proceeding . . . by evidence that:

(1) a declaration of their marriage has been signed as provided by this subchapter; *or*

(2) the man and woman agreed to be married and after the agreement they lived together in this state as husband and wife and there represented to others that they were married.

TEX. FAM. CODE ANN. § 2.401 (West, Westlaw through 2017 1st C.S.) (emphasis added); *see Russell v. Russell*, 865 S.W.2d 929, 932–33 (Tex. 1993); *Small v. McMaster*, 352 S.W.3d 280, 283 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). The trial court granted the directed verdict based upon uncontroverted evidence that Gasaway and Durrill did not represent themselves to others as married before November 2, 2015. "Holding out" is an essential element of an informal marriage. TEX. FAM. CODE ANN. § 2.401(a)(2); *Ex parte Threet*, 333 S.W.2d 361, 364–65 (Tex. 1960).

Gasaway and Durrill's Declaration swore that they began a common-law marriage on January 22, 2010. A filed declaration of marriage is "prima facie evidence of the marriage of the parties," *see* TEX. FAM. CODE ANN. § 2.404(d) (West, Westlaw 2017 through 1st C.S.), yet the declaration may be rebutted with contrary evidence. *Colburn v. State*, 966 S.W.2d 511, 515 (Tex. Crim. App. 1998).[14]

---

[14] The *Colburn* Court held that the trial court did not abuse its discretion by disregarding a filed

Gasaway relies upon the Declaration as prima facie evidence of the marriage to invoke the separate presumption of validity. TEX. FAM. CODE ANN. § 1.101 (West, Westlaw 2017 through 1st C.S.).[15] The presumption that a marriage is valid may also be rebutted. *Nixon v. Wichita Land & Cattle Co.*, 19 S.W. 560, 561 (Tex. 1892); *see also Miller v. Berryhill*, No. 5:16-CV-078, 2017 WL 2493626, at *5–6 (N.D. Tex. May 16, 2017), *adopted by* 2017 WL 2493131 (N.D. Tex. June 8, 2017) (finding that contradictory evidence rebutted the presumption of validity of the informal marriage supported by a filed declaration).

Gasaway argued that the Durrill children were not entitled to a directed verdict because they did not overcome the presumption created by the Declaration that the marriage is valid. *See Estate of Claveria v. Claveria*, 615 S.W.2d 164, 165–66 (Tex. 1981); *Schacht v. Schacht*, 435 S.W.2d 197, 201 (Tex. Civ. App.—Dallas 1968, no writ) (holding presumption of validity of marriage was rebutted by evidence).

**C.    Analysis**

Gasaway testified that she and Durrill cohabited from 2009 until his death, but they did not tell others they were married until after November 2015, except that Gasaway believed she told Mir they were "common-law." Durrill did not tell anyone Gasaway was his wife until after November 2, 2015. Gasaway further testified that she did not use Durrill as her surname until after November 2, 2015. They each filed tax returns as single

---

declaration of informal marriage after the proponent testified contrary to the declaration and thereby contradicted any presumption of validity. *Colburn v. State*, 966 S.W.2d 511, 515 (Tex. Crim. App. 1998).

[15] "It is the policy of this state to preserve and uphold a marriage against a claim of invalidity, unless strong reasons exist for holding it void or voidable. Therefore, every marriage entered into in this state is presumed to be valid . . . ." TEX. FAM. CODE ANN. § 1.101 (West, Westlaw 2017 through 1st C.S.).

persons for the years 2010 through 2014 according to Gasaway and Buckley.

Holtz testified that she asked Gasaway whether she and Durrill were married after Durrill's stroke in November 2012. Gasaway denied that they were married.

Dr. Dodson treated Durrill beginning in late 2012 and continuing until his death in 2016. His intake records reflect that Durrill's marital status was widowed, and phone messages left by Gasaway reflected her status as "Georgeanne, girlfriend." Dr. Dodson's records after 2015 occasionally refer to Gasaway as Durrill's wife.

Buckley testified that she and Durrill spoke regularly from the 1990's until the last years of his life. Neither Durrill nor Gasaway said anything about being married to each other until after November 2, 2015, when Durrill told Buckley in mid-November 2015, after the Declaration was filed, "I never thought I would get married again."

Durrill had a long-standing personal and professional relationship with Anderson who did much of Durrill's business work for over thirty years. Anderson testified that Durrill sold various pieces of real estate between 2010 and 2015, and on each of the deeds stated that he was single or widowed. Durrill's marital status was important to the title companies in each of those transactions. Anderson spoke to and saw Durrill regularly. Durrill told Anderson that he was not getting married again. In 2014, Durrill specifically denied to Anderson that he was married to Gasaway when he and Anderson were working on the codicil to leave property to Gasaway.[16] Durrill did not tell Anderson

---

[16] Anderson testified regarding the codicil that Durrill signed in September 2015:

[Durrill] just wanted [Gasaway] to have the right to live in [the house]. And so we had [] a discussion. I had to make him aware that he had to put it in his will, because since they weren't married that the only way she could maintain a life estate in the house is if he specifically granted that in the context of the Codicil. If he had died without that language, she would have no right to live in that house as not being his wife. And he's telling me as

24

he was married to Gasaway until after November 2, 2015.

Eric testified that Gasaway told him that she and Durrill were married yesterday, referring to November 2, 2015.

Kelly worked for Durrill in 1983 and continued to work for him and Durrill Properties until after Durrill died. She last saw him in the summer of 2015. He did not tell her he was married to Gasaway.

In 2014, when Durrill was honored at an American Heart Association gala, the Heart Ball, Gasaway was introduced as Durrill's "companion."

In April 2015, Phil Benz, Durrill's long-time friend from the Navy, stayed with Durrill and Gasaway for several days. Benz testified that Durrill did not tell Benz that he and Gasaway were married, nor did Durrill refer to Gasaway as his wife. Other long-time friends of Durrill's, Neal and former Nueces County Sheriff Jim Kaelin, each testified that Durrill did not indicate that he was married to Gasaway before November 2015.

Durrill never told Holtz that he was married to Gasaway. After the Declaration was filed, Holtz found out about it through the lawyers. She and her family were not invited to the wedding reception on November 14, 2015. There was an email sent to the children that announced the marriage, but they doubted that the email came from Durrill. The email dated November 16, 2015 purports to be from Durrill and states: "Got married *a few days ago* & wanted you to understand." (emphasis added).

Gasaway argues that a funeral announcement (that ran on a single day) describing her as Durrill's wife is some evidence of an informal marriage before and after November

we sit there, I am not married to her. So I said, so we need it put it in there? He said, I want you to put it there . . . .

25

2, 2015. However, two other funeral announcements were published, one the day before and one the day after the one Gasaway cites, each of which refer to Gasaway as Durrill's "companion." Holtz testified that the announcement cited by Gasaway was revised to refer to her as Durrill's wife solely to prevent Gasaway from delaying the funeral due to disagreements between her and the children.

Gasaway cites generally to medical records that refer to her as Durrill's wife, particularly those of Dr. Dodson. Yet Dr. Dodson's intake notes for Durrill in 2012 stated Durrill was widowed even though Gasaway accompanied Durrill to the office and may have filled out the forms. In December 2012, the discharge notes from the rehabilitation hospital after Durrill's stroke, recite Durrill's social history in part, "Patient lives in 2 story home with an elevator with his girlfriend." Durrill's social history from July 2011 by his previous primary care physician, Dr. Sutter, reflects, "Widowed. Auth Release 3/2/11: Bill Durrill, Jr., son: Georgeanne Gasaway, girlfriend."

Mir, whose company provided care-givers to Durrill beginning in September 2015, shows Durrill's marital status as widowed in the initial paperwork, but also reflects Gasaway as the primary contact. Notes after November 2, 2015, refer to Gasaway as Durrill's wife.

Records from Caring Senior Services dated September 24, 2015 by Kelly Diggs reflect that Gasaway was the informant and described herself as Durrill's spouse, but in another portion of the record on the same date, the records state that Durrill's marital status is widowed and Gasaway is his girlfriend. Nursing notes dated February 26, 2016, reflect that Gasaway and Durrill were married recently.

Although the Declaration may be some evidence that Durrill and Gasaway were married from January 22, 2010 until November 2, 2015, Gasaway admitted that they did not hold themselves out to others as married at any time before November 2, 2015. *See City of Keller*, 168 S.W.3d at 814 ("Undisputed contrary evidence may also become conclusive when a party admits it is true"). "Whether the evidence is sufficient to establish that a couple held themselves out as husband and wife turns on whether the couple had a reputation in the community for being married." *Small*, 352 S.W.3d at 285.

Because Gasaway admitted that she and Durrill did not hold themselves out as married to the community, there was no valid informal marriage before November 2, 2015, and thus, no presumption of validity of a marriage before that date. *See Ex parte Threet*, 333 S.W.2d at 364–65 (noting that keeping an alleged common-law marriage secret "is inconsistent and irreconcilable with the requirement of a public holding out that the couple are living together as husband and wife."); *Small*, 352 S.W.3d at 283 (holding all elements of an informal marriage must be proved). Gasaway's admission, along with the other evidence, conclusively negated the "holding out" element of a pre-November 2, 2015 informal marriage. *See Ex parte Threet*, 333 S.W.2d at 364–65. As a result, the trial court correctly granted a directed verdict that there was no informal marriage before November 2, 2015. We overrule Gasaway's second issue.

## IV. WHEN DID DURRILL'S MARRIAGE TO GASAWAY, IF ANY, BEGIN?

In her first issue, Gasaway argues that the children failed to establish as a matter of law that the marriage commenced no earlier than three years before Durrill's death.

27

*See* TEX. EST. CODE ANN. § 123.102.[17]   Gasaway further argues that the children failed to obtain a jury finding on this issue.   Because Gasaway alleges that this is an element of the children's cause of action, we construe this issue as a "no evidence" complaint that we review de novo.   *See City of Keller*, 188 S.W.3d at 823.

Gasaway and Durrill's filed Declaration asserted an informal marriage beginning on January 22, 2010.   However, the trial court found the evidence conclusively established that they did not represent themselves as married to others before that date. As a result, we overruled Gasaway's challenge to the directed verdict in her second issue. Thus, any marriage between Durrill and Gasaway could only have occurred on or after November 2, 2015, less than three years before Durrill died in April 2016.   We overrule Gasaway's first issue.

## V.    ALLEGED CONCEALMENT OF THE 2014 CODICIL

By her third issue, Gasaway argues that the 2014 codicil drafted by Anderson that he allegedly concealed gives rise to a presumption of marriage. The codicil granted Gasaway twenty percent of some of Durrill's assets, a life estate in Durrill's house, and the right to funeral plots beside him.

Durrill's 2004 will was prepared by attorney Richard Leshin.   An application to

---

[17] (a) Subject to Subsection (c), if a proceeding described by Section 123.101(a) is not pending on the date of a decedent's death, an interested person may file an application with the court requesting that the court void the marriage of the decedent if:
   (1) on the date of the decedent's death, the decedent was married; and
   (2) *that marriage commenced not earlier than three years before the date of the decedent's death*.
(b) The notice applicable to a proceeding for a declaratory judgment under Chapter 37, Civil Practice and Remedies Code, applies to a proceeding under Subsection (a).
(c) An application authorized by Subsection (a) may not be filed after the first anniversary of the date of the decedent's death.

TEX. EST. CODE ANN. § 123.102 (West, Westlaw through 2017 1st C.S.) (emphasis added).

probate the 2004 will was filed the day Durrill died. Anderson prepared and held the 2014 codicil according to Durrill's instructions. Anderson filed the codicil two weeks after Durrill's death and provided copies to the parties.

Gasaway argues that Durrill's bequest of the funeral plots was evidence that Durrill publicly recognized their marriage as of the date of the codicil in September 2014. However, the codicil and its contents were known only to Durrill and Anderson until after Durrill died. Anderson testified that he did not show the codicil to anyone during Durrill's lifetime because Durrill expressly instructed him not to do so. A secret codicil does not constitute a "holding out" before the codicil was published. *See Ex parte Threet*, 333 S.W.2d at 364–65.

Gasaway also argues that the codicil treats her as a wife would be treated and therefore, is proof that Durrill recognized her as his wife. This argument also fails. The codicil does not refer to Gasaway as his wife and the provision for a life estate in the house was necessary only because Durrill told his attorney they were *not* married. Otherwise Gasaway would be entitled to a life estate as a matter of law. *See* TEX. EST. CODE ANN. §§ 102.002, 102.003 (West, Westlaw through 2017 1st C.S.).

Finally, Gasaway argues that Anderson's concealment of the 2014 codicil amounted to spoliation or criminal conduct. However, there is no evidence that Anderson did anything other than follow Durrill's explicit instructions not to reveal the codicil to anyone until Durrill's death. Gasaway supports her argument with citation to criminal statutes and cases involving spoliation of evidence. We do not find that authority controlling or persuasive given the very different facts in this case.

29

Gasaway's argument that the allegedly concealed codicil supports her claim that she was married to Durrill in September 2014 has no legal or evidentiary support. We overrule Gasaway's third issue.

## VI.    CHARGE ERROR

By Gasaway's fourth and fifth issues she contends that the trial court's refusal of her requested jury instructions constituted reversible error. The trial court refused proposed jury instructions: 1) that a marriage is presumed valid; and 2) regarding the effect of a declaration of informal marriage.

### A.    Standard of Review and Applicable Law

A trial court must give "such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX. R. CIV. P. 277. A trial court has considerable discretion to determine proper jury instructions, and "[i]f an instruction might aid the jury in answering the issues presented to them, or if there is any support in the evidence for an instruction, the instruction is proper." *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012) (quoting *La.-Pac. Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998)). "We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review." *Id.* at 687 (quoting *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000)) (internal citations omitted). "When a trial court refuses to submit a requested instruction on an issue raised by the pleadings and evidence, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict." *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (per curiam). To determine whether an instruction or its absence caused harm, this Court must review

30

the record as a whole. *See Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 749–50 (Tex. 1980); *Chandler v. Chandler*, 842 S.W.2d 829, 834 (Tex. App.—El Paso 1992, writ denied). The omission of an instruction is reversible error only if the omission probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1(a); *see Wal–Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723 (Tex. 2003) (reversing due to improper jury instructions).

## B.    Discussion

Gasaway's counsel requested a jury instruction on the statutory presumption that every marriage is valid. The trial court rejected the instruction. Gasaway's counsel also requested instructions on proof of an informal marriage following a portion of section 2.401 of the family code and on the effect of filing a declaration and registration of informal marriage. *See* TEX. FAM. CODE ANN. §§ 2.401, 2.402 (West, Westlaw through 2017 1st C.S.). The trial court also refused those instructions.

The questions submitted to the jury asked:

**<u>QUESTION 1</u>**

Did William "Dusty" Durrill, Sr. have the mental capacity to consent to a marriage and understand the nature of the Declaration and Registration of Informal Marriage executed on November 2, 2015?

A person has mental capacity if he is able to appreciate the effect of what he is doing and understand the nature and consequences of his acts and the marriage he was transacting.

Answer "Yes" or "No"

Answer Question 2 only if you answered "No" to Question 1; otherwise, do not answer Question 2.

31

## QUESTION 2

After November 2, 2015, did William "Dusty" Durrill, Sr. gain the mental capacity to recognize a marriage relationship and did recognize a marriage relationship?

A person has mental capacity if he is able to appreciate the effect of what he is doing and understand the nature and consequences of his acts and the marriage he was transacting.

Answer "Yes" or "No"

The jury answered both questions "No."

Gasaway argues that the jury should have been instructed on legal presumptions and the requisites of an informal marriage. Although an instruction may be necessary to define legal or technical terms, marriage is a word that is generally understood within the community. The object of the jury questions was to determine Durrill's capacity to understand what he was doing and its legal effect. The instructions Gasaway submitted did not further that goal and thus, their absence could not have caused an improper verdict.

An additional reason for the trial court to refuse Gasaway's proposed instructions was that they constituted an improper comment on the weight of the evidence. *See* TEX. R. CIV. P. 277. "The court shall not in its charge comment directly on the weight of the evidence or advise the jury of the effect of their answers . . . ." *Id.* A jury instruction constitutes an impermissible comment on the weight of the evidence when it encourages the jury to give undue weight to certain evidence. *Ganesan v. Vallabhaneni*, 96 S.W.3d 345, 351 (Tex. App.—Austin 2002, pet. denied) (trial court did not abuse its discretion in refusing proposed instructions). Gasaway's instructions would have improperly focused

the jury on the issue of marriage, not the issue of capacity. Accordingly, the trial court did not abuse its discretion by refusing to include the instructions. *See Shupe*, 192 S.W.3d at 580 (holding that omission of negligent entrustment issue was harmless); *see also State v. Luby's Fuddruckers Rests, LLC*, 531 S.W.3d 810, 822 (Tex. App.—Corpus Christi 2017, no pet.); *Muhs v. Whataburger, Inc.*, No. 13-09-00434-CV, 2010 WL 4657955, at *9 (Tex. App.—Corpus Christi Nov. 18, 2010, pet. denied) (mem. op.).

The Court overrules Gasaway's fourth and fifth issues.

### VII.    CONCLUSION

We affirm the judgment of the trial court.

GINA M. BENAVIDES,
Justice

Delivered and filed the
7th day of February, 2019.

33